826 F.2d 1419
 1988 A.M.C. 2112, Prod.Liab.Rep.(CCH)P 11,575
 Bess Caroline MOLETT, Individually and on Behalf of her son,
John Dreisch, Plaintiffs,
v.
PENROD DRILLING CO., Defendant-Appellee.
GEARENCH, INC., Defendant-Third Party Plaintiff-Appellee-Appellant,
v.
COLUMBUS-McKINNON, INC., Third Party Defendant-Appellant.
 No. 86-4665.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 15, 1987.
Rehearing Denied Oct. 13, 1987.
 
 David R. Frohn, Camp, Carmouche, Barsh, Gray, Hoffman & Gill, Lake Charles, La., for Columbus-McKinnon, Inc.
 Jeffrey A. Rhoades, Davidson, Meaux, Sonnier & McElligott, V. Farley Sonnier, Lafayette, La., for Gearench, Inc.
 Daniel Meeks, Abbott, Webb, Best & Meeks, Michael J. Kincade, New Orleans, La., for Penrod Drilling.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before RUBIN, GARZA, and JONES, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 The seller of a chain compromised a liability suit against it and seeks indemnity from the manufacturer of the chain pursuant to its third party demand in that suit. The district court held that the chain was defective, and the seller who marketed the chain under its own name was entitled to indemnification from the manufacturer of the chain but not to contribution from the owner of the barge on which the accident occurred. Both the manufacturer and the seller appealed. We hold that the manufacturer must fully indemnify the seller for the amount reasonably paid in settlement, remand for determination of reasonableness of the amount paid, and pretermit decision on the seller's conditional appeal against the ship owner.
 
 I.
 
 2
 On January 27, 1983, John Molett, III, and Harold E. Landry were killed in an accidental fall while constructing the derrick on a jack-up barge owned by Penrod Drilling Company. Penrod had contracted with Marathon LaFourneau Company to construct the rig at Marathon's shipyard near Vicksburg, Mississippi. After Marathon had virtually completed the rig, Marathon had it towed to Belle Chasse, Louisiana, for final outfitting, including erection of leg sections and a derrick that would have been too tall to pass under bridges between Vicksburg and the Gulf of Mexico. Marathon subcontracted with McBroom Rig Builders, Inc., Molett and Landry's employer, to erect the derrick.
 
 
 3
 On the day of the accident, Molett and Landry were completing construction of the top sections of the derrick. To lift materials to the top of the derrick, McBroom used an apparatus known as a "gin pole" which had been fabricated by Penrod. The forty-foot pole was equipped with pulleys and other tackle with one end anchored to the derrick so that the upper end of the pole could be suspended leaning away from the derrick structure and used as a portable stiff-leg crane. As construction of the derrick progressed it was necessary from time to time to "jump" the gin pole farther up the derrick so that materials could be lifted higher. "Jumping the gin pole" was accomplished by securing a chain around the uppermost derrick beams and suspending from the chain a pulley system designed to draw up the pole. The base of the gin pole would then be detached from the derrick, the lift executed, and the gin pole resecured.
 
 
 4
 The "jump" during which the accident occurred was the first one attempted that day. Molett and Landry were standing on a scaffold 147 feet above the rig floor waiting for the gin pole to be raised. To lift the gin pole, McBroom employees wrapped a new spinning chain around the top derrick beams and attached to it a snatch block and related tackle. Two hooks had been attached to the chain, and one was inserted into the chain to secure it to the beam. The second hook was left dangling, unused, over the side of the beam. As the lift was attempted, the gin pole suddenly broke loose and fell, hitting the scaffold on which Molett and Landry were standing and sending them and most of their equipment tumbling to the rig floor. In violation of state, federal, and company safety regulations, neither man was wearing a safety line when the accident occurred.
 
 
 5
 After the accident, McBroom employees searched for evidence of its cause. They discovered a chain still hanging from the top derrick beam, almost entirely unwound and missing one hook, and the snatch block intact on the rig floor. The missing hook and any remnant of chain that may have been attached to it were never recovered, evidently having fallen into the river.
 
 
 6
 The survivors of Molett and Landry brought wrongful death actions against Penrod, Marathon, and other companies believed to be the manufacturers of the chain and hook used to lift the gin pole when the accident occurred. Ultimately, it was discovered that the chain bore the trademark of Gearench, Inc., and that the hook was manufactured by Kulkoni, Inc. The complaint was therefore amended to name those companies as defendants guilty of manufacturing defective products. Thereafter, Gearench filed a third-party demand against Columbus McKinnon, Inc., contending that Columbus McKinnon had actually manufactured the allegedly defective chain and that Gearench had not contributed in any way to any defect that might have existed. Gearench also sought contribution from Penrod for any liability imposed against it, contending that Penrod was at fault for failing to ensure that McBroom employees used safety lines.
 
 
 7
 The case was tried before a jury with attorneys representing all named parties present. On the fourth day of trial, during jury deliberations, Gearench settled with the plaintiff families, paying $1 million to each. While counsel were informing the court of the settlement agreement, the jury sent notice that it had reached a verdict. The trial judge announced that, because a settlement had been reached, he would decide Gearench's third-party claim for indemnity and contribution against Columbus McKinnon and Penrod. None of the parties objected, and, in the presence of counsel, the judge discharged the jury without obtaining their verdict. The trial judge then proceeded--after argument and briefing--to decide the remaining issues.
 
 
 8
 The district court held that the gin pole fell because the chain by which it had been suspended broke. Although Gearench had sold the chain under its trademark as its own product, the court found that the chain had actually been manufactured by Columbus McKinnon, that it was unreasonably dangerous in normal use (hence defective), and that the defect caused the accident. The court concluded further that Gearench was unaware of the defect and in no way caused or contributed to the problem. Similarly, Penrod was found blameless for the fact that McBroom employees were working on its vessel without safety lines.
 
 
 9
 In its conclusions of law the district court held that Gearench's third-party demand against Penrod for indemnity or contribution is governed by Sec. 905(b) of the Longshore and Harbor Workers' Compensation Act[1] and that Gearench failed to establish that Penrod had actual knowledge of a dangerous condition leading to the decedents' deaths or was aware that McBroom was unreasonably failing to protect its employees from such a condition.[2] It therefore concluded that Gearench's claim against Penrod must fail.
 
 
 10
 The court next concluded that Columbus McKinnon, as the actual manufacturer of a defective product that caused the deaths, is strictly liable in tort for the damages under either Louisiana or maritime law. The court concluded that, because Gearench had held the product out as its own, Gearench's liability to members of the public injured by the product mirrors that of the manufacturer. After reviewing related law, however, the court determined that under both Louisiana and maritime law a non-negligent "professional vendor" is entitled to indemnity from the negligent manufacturer and therefore that Gearench was entitled to indemnity from Columbus McKinnon. It made no finding concerning the reasonableness of the amount paid in settlement.
 
 
 11
 Columbus McKinnon now appeals from the judgment against it contending: (1) the district court denied Columbus McKinnon its right to a jury trial by adopting the role of fact-finder in deciding the third-party claims; (2) the record is inadequate to support a finding that a manufacturing defect in the chain caused the accident; (3) Louisiana law should be applied to the indemnity claim against Columbus McKinnon, and under Louisiana law a professional vendor such as Gearench is considered a joint tort-feasor ineligible to recover full indemnification; and (4) if maritime law applies, Gearench is not entitled to indemnity on a mere showing of potential liability to the plaintiffs because it failed to provide Columbus McKinnon a meaningful opportunity to approve the settlement or assume defense of the suit before entering a settlement agreement. As a protective measure only, Gearench contends that, if it is not entitled to be indemnified fully by Columbus McKinnon, it is entitled to indemnity or contribution from Penrod.
 
 II.
 
 12
 Columbus McKinnon's contention that it was entitled to have factual issues relevant to its potential liability decided by a jury comes too late. The case has already been fully presented to a jury at a trial in which all interested parties were represented and afforded the opportunity to question witnesses and present evidence. Interrogatories relevant to each of Gearench's third-party claims had been drafted and submitted to the jury, and, by the time the settlement agreement was announced, the jury was prepared to deliver its verdict. At that time, any party had the right to demand that the verdict be read. Columbus McKinnon, however, remained silent as the trial judge announced his intention to decide the third-party claims himself and to discharge the jury. Even when it filed its post trial memorandum three weeks later, Columbus McKinnon gave the court no indication that it objected to the court's proposed plan.
 
 
 13
 On appeal, Columbus McKinnon argues for the first time that it never intended to waive its right to a jury trial when it silently acquiesced in the court's announced intention to decide the third-party claims. It contends that it believed the trial court intended to decide only issues of law, including whether maritime or Louisiana law governed the indemnity claim against it and whether--if maritime law applied--Gearench had offered it sufficient opportunity to participate in the settlement agreement or alternatively to choose to assume defense of the case.[3]
 
 
 14
 This justification does not explain Columbus McKinnon's failure to object to the discharging of the jury. Resolution of the legal issues Columbus McKinnon contends it recognized at that time would not necessarily have rendered the jury's findings moot, and Columbus McKinnon was not entitled to require that the entire case be again tried in the event that applicable law required Gearench to prove itself actually liable to the plaintiffs. The explanation offered by Columbus McKinnon also fails to excuse its continued silence on the jury issue in view of assertions made by Gearench in its post trial memorandum that the evidence supported a determination that it was actually liable to the plaintiffs and entitled to indemnity from Columbus McKinnon even if the court determined that proof of potential liability was not enough. Nor has Columbus McKinnon excused its failure to raise the issue before the district court in a Rule 60(b) motion for post-judgment relief once the court's opinion made its intention unmistakably clear.
 
 
 15
 Whether or not Columbus McKinnon's silence is construed as a waiver, properly speaking, of its right to jury trial, the questions it now presents raise issues not raised before the trial court, and such issues will not ordinarily be considered on appeal.[4] Columbus McKinnon's silence on the matter at trial and until now certainly suggested to the trial court and opposing parties that it acquiesced in the court's proposed plan. Columbus McKinnon may not now deny that it waived its right to a jury trial and demand a new trial only after it has lost on the merits and failed to make a timely objection before the district court. Therefore, all of the evidence having been heard, the findings of the trial court must be accepted unless clearly erroneous.[5]
 
 III.
 
 16
 To recover in a products liability suit brought under either Louisiana[6] or maritime law,[7] a plaintiff must prove by a preponderance of the evidence that: the product was defective, that is, unreasonably dangerous in normal use; the product was in normal use at the time the injury occurred; the defect caused the injury; and the defect existed when the product left the control of the manufacturer.[8] These facts, like all others, may be established by either direct or circumstantial evidence,[9] and the circumstantial evidence need not negate all other possible causes.[10] Identification of a specific defect is often impossible, and the plaintiff need create only a reasonable inference that the defective condition of the product was present at the time of manufacture.[11] If the product is proved defective by reason of its hazard in normal use, the plaintiff need not prove any particular negligence by the maker in its manufacturing processing.[12]
 
 
 17
 The trial court held that circumstantial evidence proved that the chain was unreasonably dangerous in normal use, hence defective, and that the defect in the chain caused it to break in normal use, causing the accident. Gearench was found neither to have abused the chain nor to have contributed in any way to the existence of the defect. Although the court made no specific finding that the defect existed at the time the chain was released by the manufacturer, that finding is implicit in its subsidiary findings and its conclusions that Gearench was liable to the plaintiffs and that Columbus McKinnon was bound to pay reasonable indemnification.
 
 
 18
 The evidence is sufficient to support each of these findings. Uncontroverted testimony established that the chain was in normal use at the time of the accident. The gin pole weighed approximately 1,200 pounds and was suspended from a block assembly linked into one or two loops of the chain. Thus, under any version of the facts, each link of the chain was supporting far less than its minimum rated lifting capacity of 12,500 pounds. The breaking of the chain when supporting these relatively light weights establishes per se that it was defective.
 
 
 19
 Expert testimony established that the most likely causes of the accident were failure either of the chain or the hook, as shown by the fact that only one hook remained on the chain after the accident. Testing revealed that remnants of the hook would have remained attached to the chain had the accident been caused by hook failure. Moreover, one expert testified that the description of how the chain was rigged and how the remnant was found suggested that it was the free hook that was lost. The conclusion that the chain failed is also supported by the fact that the chain measured slightly more than 18 1/2 feet after the accident whereas such chains were usually sold in standard lengths of 18 and 20 feet. Although employees of Gearench and Columbus McKinnon stated that chains were routinely cut two or three links longer than standard to insure that customers were given full value, it was also established that the chain was most likely sold to Gearench precut by Columbus McKinnon and that the additional links would normally add no more than two or three inches to the chain.
 
 
 20
 Expert testimony was introduced establishing that the chemistry of the chain varied beyond tolerances for the type of steel used and that such variation was the suspected cause of the failure. The chain remnant found after the accident also contained a misshaped link that experts said should have been rejected by factory inspectors, casting doubt on the quality of Columbus McKinnon's quality control. Although Columbus McKinnon witnesses testified that every chain was tested at levels far exceeding the weight of the gin pole, one expert testified that Columbus McKinnon's practice of simply replacing defective chain segments with new material created a likelihood that some material left the factory untested.
 
 
 21
 Columbus McKinnon contends that the evidence does not reasonably exclude the possibility that the chain had been abused before the accident. Columbus McKinnon notes, in particular, testimony that Penrod employees had borrowed and used the chain before the accident. That fact, however, does not establish a reasonable basis to conclude that the chain was abused. No one noted having noticed anything wrong with the chain before the accident, and testimony was offered that significant structural damage to the chain so close to its end would almost certainly have been discovered by employees rigging the chain to jump the gin pole. Similarly, the record contains no evidence of prior abuse of the chain by McBroom employees or Gearench.
 
 
 22
 The findings of the district court are, therefore, amply supported by the record.
 
 IV.
 
 23
 Because it concluded that Gearench is entitled to be indemnified by Columbus McKinnon under either Louisiana or maritime law, the district court declined to decide which body of law governs this product liability action. Columbus McKinnon argues, however, that the accident in this case lacked sufficient nexus with traditional maritime activities to satisfy the test of maritime jurisdiction set forth by the Supreme Court in Executive Jet Aviation, Inc. v. City of Cleveland.[13] Consequently, it contends both that Louisiana law governs and that under Louisiana law a professional vendor holding products out to the public as its own is not entitled to full indemnification from the manufacturer.
 
 A.
 
 24
 In Executive Jet, the Supreme Court rejected the notion that maritime tort jurisdiction can be determined on the basis of the location of the injury alone. In the absence of legislation to the contrary, the Court held, maritime jurisdiction of a tort claim exists only when the injury occurs on or over navigable waters and the wrong bears a significant relationship to traditional maritime activity,[14] thus significantly restricting the scope of that jurisdiction as it had previously been exercised by lower federal courts. Because Molett and Landry were injured while working aboard a nearly completed vessel on navigable waters, the locality portion of the test is satisfied. The issue is whether the injury on which suit is based had the requisite significant relationship to traditional maritime activities, a quality also called "maritime flavor" or "nexus to maritime activities."[15]
 
 
 25
 The use of such terms as "significant relationship," "maritime flavor," and "nexus" to describe the kind of claim that satisfies the second part of the Executive Jet test indicates that the criteria are so imprecise as to defy description by either a formula or an objective standard. In Foremost Insurance Company v. Richardson[16] the Supreme Court held that direct involvement in maritime commercial activity is not essential, finding maritime jurisdiction to extend to a collision between two pleasure vessels, but this decision tells us only that such involvement is not necessary without elucidating what does suffice.
 
 
 26
 The Court's decisions in Executive Jet and Foremost suggest that indicia of maritime flavor can be found in (1) the impact of the event on maritime shipping and commerce (2) the desirability of a uniform national rule to apply to such matters and (3) the need for admiralty "expertise" in the trial and decision of the case. Before these decisions had been rendered, this court, in Kelly v. Smith,[17] had outlined four factors to be considered in determining the existence of a substantial maritime relationship: the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admirality law.[18] Without abandoning Kelly v. Smith, we apply both its analysis and the indicia divined from Executive Jet and Foremost.
 
 
 27
 The fatal accident had no greater impact on maritime commerce than if it had occurred while the derrick was being erected in the Mississippi shipyard. Molett and Landry were land-based rig builders engaged in building an oil derrick on an incomplete jack-up barge. Neither derrick building nor ship construction has traditionally been considered a maritime business,[19] and the record contains no suggestion that the men were performing any other tasks customarily done by seamen. Similarly, the role in the accident attributed to Gearench and Columbus McKinnon creates no substantial maritime nexus. Columbus McKinnon manufactured chains, in this case a spinning chain typically used in oil production. Although it may have been foreseeable that the chain eventually might be used on a drilling barge for maritime purposes, such uses certainly were not the expected norm. Gearench's role in selling this particular chain to a rigging company such as McBroom similarly evokes no flavor of admiralty.
 
 
 28
 It might be desirable to have nationally uniform products liability rules, but the nature and scope of products liability has been left to the states, and no more disruption arises from applying the state-law rules to this accident than if it had occurred in the shipyard. The application of products liability rules to such an accident requires no expertise in maritime law. Although the vehicle upon which the accident occurred was a drilling barge, that fact is at most tangential. The barge was not complete or in navigation when the accident occurred, and the accident neither caused harm to the barge nor can be specifically attributed to the location of the derrick on a vessel. These facts distinguish this case from those cited to us by Gearench in support of application of maritime law.[20] Moreover, as noted above, the chain used was of a type predominantly employed for nonmaritime purposes. Neither the vehicle nor the instrumentalities involved, therefore, raise considerations creating a significant nexus to traditional maritime activities.
 
 
 29
 In Woessner v. Johns-Manville Sales Corp.,[21] we considered whether a worker's exposure to asbestos dust while working aboard vessels in navigable waters was a sufficient basis for maritime tort jurisdiction. Even though the plaintiff had been doing work traditionally done by members of the ship's crew, we held that "where neither the defendant, the injury, nor the instrumentality of the injury has any particular connection to maritime navigation or commerce, other concerns such as the demands of federalism may override."[22] Turning to the Kelly factors, we found it significant that the workers, like Molett and Landry, were land based, pointed to the state interest in providing uniform treatment to similarly situated workers, and declined admiralty jurisdiction. Thus this court has expressly applied the narrow view of admiralty jurisdiction articulated in Executive Jet.
 
 
 30
 The causation and type of injury involved in this case also appear to be unrelated to its occurrence on navigable waters. Every factor identified as a cause of the accident might have occurred as easily on land, and the injuries the parties suffered are indistinguishable from those arising out of similar land-based mishaps.[23]
 
 
 31
 Finally, we note that traditional concepts of the role of admiralty law do not justify treating this accident as a maritime tort. In Executive Jet the Supreme Court summarized the matters with which admiralty law traditionally has been concerned:
 
 
 32
 That law deals with navigational rules--rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.[24]
 
 
 33
 Gearench has not established that this tort raises any such concerns or that it evidences an overriding need to establish a uniform development of law governing maritime industries.[25]
 
 
 34
 We conclude, therefore, that the accident in this case is insufficiently connected to traditional maritime activity to invoke admiralty jurisdiction. Molett's and Landry's product liability claims and Gearench's related claim for indemnity, therefore, are governed by Louisiana law.
 
 B.
 
 35
 In Louisiana, a non-manufacturer seller of a defective product is not liable for damages in a products liability action unless he knew or should have known that the products sold were defective.[26] But knowledge of a product's defects is imputed to "professional vendors" who market products as their own and whose relationships with manufacturers make the sellers capable of controlling the quality of their merchandise.[27] Such sellers are liable to the public in the same manner as the manufacturer.[28] The district court therefore concluded properly that Gearench, having sold the chain to McBroom under its own trademark and having had such a sustained relationship with Columbus McKinnon as to make it capable of exercising quality control, was liable to the plaintiffs for injuries caused by the defect in the chain.
 
 
 36
 The imputing of knowledge to non-negligent retailers so as to make them liable is meant to protect the public, not the manufacturer or party actually at fault. Louisiana has, therefore, adopted the general rule that a party, like Gearench, whose fault is merely constructive or vicarious is entitled to full indemnity from the party whose actual fault caused injury.[29] This right has been extended to a non-negligent retailer held liable to its customer for damages by an appliance it installed in the customer's home.[30] Under this rule, Gearench would be entitled to indemnification from Columbus McKinnon.
 
 
 37
 Citing Penn v. Inferno Manufacturing Corp.,[31] however, Columbus McKinnon argues that a different rule applies in Louisiana to professional vendors who hold out products as their own because such sellers are deemed per se negligent for failing to detect the defect and for mislabeling the product as their own. In Penn, the Louisiana court denied the retailer's indemnity claim against the manufacturer not because a professional seller is per se liable jointly with the manufacturer under strict liability but because the court found that the seller was directly involved in the manufacturing process. The pressure gauge sight glasses that failed in that case were poured and cast in molds provided by the seller, and the court noted that faulty or defective molds might have created the bubbles in the glass that caused the failure.[32] The court also noted that, because of its involvement in the manufacturing process, the retailer was negligent for failing to inspect the finished product and for failing to warn customers of potential hazards. Given these facts, we do not believe that Louisiana courts would interpret Penn as establishing a rule that professional vendors are guilty of actual fault simply for failing to detect hidden defects and labeling products as their own. In all other respects relevant to the present case, Louisiana products liability law is in accord with the law of the majority of other states. We therefore conclude that the district court acted properly by referring to the law of other states to determine Gearench's indemnity claim. A non-negligent professional seller is entitled to indemnity from the actual manufacturer of a defective product.[33]
 
 
 38
 Columbus McKinnon argues alternatively that Gearench exercised sufficient control over production of the chain to make Penn applicable. This contention simply is not supported by the record. However much Gearench might have monitored manufacturing, it actually participated in design and manufacture only by requesting that the chain be embossed with its mark and capable of lifting a specified weight with a specified amount of elongation. The materials employed and the method of manufacture were left completely in the discretion of Columbus McKinnon, and the evidence established that Columbus McKinnon altered its production techniques at will. Because the evidence adequately supports the trial court's finding that Gearench in no way contributed to the defect in the chain and is not guilty of actual fault for the injury that resulted, it is entitled to recover from Columbus McKinnon the full amount it reasonably paid the plaintiffs in settlement.
 
 
 39
 Our determination that Gearench is entitled to indemnification does not, however, end our inquiry. We have held that an indemnitee who settles a claim against it without first tendering the settlement for approval or offering the defense in exchange for a hold-harmless agreement must, to recover from its indemnitor, prove that it was actually liable for the amount paid,[34] the settlement was reasonable, and the indemnitor was not prejudiced by the indemnitee's failure either to inform the indemnitor of settlement negotiations or to tender it the defense of the suit. Otherwise, the indemnitee might spend the indemnitor's money without either a judgment of the court or the indemnitee's agreement. Such proof is not, of course, required if the indemnitee's claim is founded on judgment or on a written contract establishing some other basis for indemnification, and actual liability need not be shown if the indemnitor was tendered the defense and refused it.[35] Even if the indemnitee tenders the defense and is not required to show actual liability, it must demonstrate both its potential liability to the original plaintiff[36] and the reasonableness of the settlement.
 
 
 40
 While the decisions on which we rely were not based on Louisiana law, their logic is unassailable, and counsel have cited no Louisiana decisions to the contrary. We therefore apply their principles. Gearench offered no real opportunity to Columbus McKinnon either to negotiate the settlement or to take over defense of the suit. Its third party demand against Columbus McKinnon came before the trial. It negotiated the settlement without, so far as the record shows, even informing Columbus McKinnon of the negotiations. It reached its agreement with the plaintiffs after the case had been fully tried. Columbus McKinnon at that time had no real opportunity either to defend or to participate in negotiations. It was not obliged, and it refused, to stipulate to the reasonableness of the settlement. While its liability may have been certain, it was presented with a fait accompli as to consent. Even if actually liable, it should not be cast absent proof that the amount paid was reasonable.
 
 
 41
 The district court's fact findings are sufficient to establish actual liability, but they do not even intimate a determination that it was reasonable to pay each group of survivors $1 million.
 
 
 42
 Unlike the district court's implied finding that the defect that caused the accident existed when the chain left the factory, the question whether the reasonableness of the amount of settlement was considered and decided is not answered by the court's subsidiary findings. The question involves not only the proof of liability and the amount of damages sustained but also the extent to which the failure of Molett and Landy to wear safety belts, and of McBroom to ensure that belts were worn, contributed to the men's deaths. We must therefore remand the case for the district court to decide the reasonableness of the amount paid on each claim.
 
 V.
 
 43
 Because we have determined that Louisiana law governs the products liability claim and that the record supports the trial court's finding that Gearench was actually liable to the plaintiffs under Louisiana law, we do not address Columbus McKinnon's alternative position that--had maritime law applied--Gearench's request that Columbus McKinnon either approve the settlement or assume defense of the action was insufficient to entitle it to indemnity on a mere showing of potential liability. Similarly, we need not decide Gearench's conditional claim for contribution or indemnity from Penrod. Gearench is entitled to recover from Columbus McKinnon all monies it reasonably agreed to pay the plaintiffs, and Columbus McKinnon has not sought contribution from Penrod. Moreover, should the district court determine that any portion of Gearench's settlement was unreasonable, Gearench would not be entitled to recover the excess from either Columbus McKinnon or Penrod.[37]
 
 
 44
 For the reasons stated above, the judgment of the district court is AFFIRMED except that the matter is REMANDED for specific findings on the reasonableness of the amount of the settlement.
 
 
 
 [1]
 33 U.S.C. Sec. 901 et seq. (1982)
 
 
 [2]
 See Scindia Steam Navigation Co., Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); Helaire v. Mobil Oil Co., 709 F.2d 1031, 1035-40 (5th Cir.1983)
 
 
 [3]
 See Parfait v. Jahncke, Inc., 484 F.2d 296 (5th Cir.1973)
 
 
 [4]
 See, e.g., Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); United States v. Allegheny-Ludlum Indus., Inc., 517 F.2d 826, 840 n. 13 (5th Cir.1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir.1973), aff'd sub nom. East Carroll Parish School Bd. v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Compare Lirette v. N.L. Sperry Sun, Inc., 820 F.2d 116 (5th Cir.1987) (en banc)
 
 
 [5]
 Fed.R.Civ.P. 52(a)
 
 
 [6]
 Joseph v. Bohn Ford, Inc., 483 So.2d 934, 940 (La.1986)
 
 
 [7]
 See East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986); Watz v. Zapata Off-Shore Co., 431 F.2d 100, 120 (5th Cir.1970)
 
 
 [8]
 Joseph, 483 So.2d 934, 940 (La.1986); Restatement of Torts 2d, Sec. 402A
 
 
 [9]
 Joseph, 483 So.2d at 940; Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971)
 
 
 [10]
 DeBattista v. Argonaut-Southwest Insurance Company, 403 So.2d 26 (La.1981), cert. denied, 459 U.S. 836, 103 S.Ct. 82, 74 L.Ed.2d 78 (1982)
 
 
 [11]
 Joseph, 483 So.2d at 940
 
 
 [12]
 Id
 
 
 [13]
 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972)
 
 
 [14]
 Id. at 268, 93 S.Ct. at 504
 
 
 [15]
 Smith v. Pan Air Corp., 684 F.2d 1102 (5th Cir.1982)
 
 
 [16]
 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982)
 
 
 [17]
 485 F.2d 520 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974)
 
 
 [18]
 485 F.2d at 525
 
 
 [19]
 See, e.g., Lowe v. Ingalls Shipbuilding, A Division of Litton, 723 F.2d 1173, 1185, 1187 (5th Cir.1984)
 
 
 [20]
 See, e.g., Lewis v. Timco, Inc., 716 F.2d 1425, 1427 (5th Cir.1983) (en banc); Sperry Rand Corp. v. Radio Corp. of America, 618 F.2d 319 (5th Cir.1980); Jig the Third Corp. v. Puritan Mar. Inc. Under. Corp., 519 F.2d 171 (5th Cir.1975)
 
 
 [21]
 757 F.2d 634, 646 (5th Cir.1985)
 
 
 [22]
 Id. at 643
 
 
 [23]
 See Id., at 647; Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co., 644 F.2d 1132, 1137-38 (5th Cir.), cert. denied, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981)
 
 
 [24]
 409 U.S. at 270, 93 S.Ct. at 505
 
 
 [25]
 See Foremost Ins. Co., 457 U.S. at 677, 102 S.Ct. at 2660, 73 L.Ed.2d 300 (1982); Owens-Illinois, Inc. v. United States District Court, 698 F.2d 967, 971 (9th Cir.1983)
 
 
 [26]
 Jones v. Employer's Mutual Liability Ins. Co., 430 So.2d 357, 359 (La.App.1983); Harris v. Atlantis Stove Works, Inc., 428 So.2d 1040, 1043 (La.App.), writ denied, 434 So.2d 1196 (La.1983); Hudgens v. Interstate Battersy Systems of America, Inc., 370 So.2d 202, 209 (La.App.), writ denied, 371 So.2d 835 (La.1979)
 
 
 [27]
 Chappius v. Sears, Roebuck & Co., 358 So.2d 926, 930 (La.1978)
 
 
 [28]
 Id
 
 
 [29]
 See Dusenbery v. McMoRan Exploration Co., 458 So.2d 102, 105 (La.1984); Appalachian Corp. v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (1922)
 
 
 [30]
 Fairburn v. Montgomery Ward & Co., Inc., 349 So.2d 1280, 1282 (La.App.1977)
 
 
 [31]
 199 So.2d 210 (La.App.), writ denied, 202 So.2d 649 (La.1967)
 
 
 [32]
 Id. at 218
 
 
 [33]
 See Burch v. Sears, Roebuck & Co., 320 Pa.Super. 444, 467 A.2d 615, 622-23 (1983); L. Frumer & M. Friedman, 3A Products Liability Sec. 44.02[b] & n. 9 (1986)
 
 
 [34]
 Whisenant v. Brewster-Bartle Offshore Company, 446 F.2d 394 (5th Cir.1971) (relying on Tankerederiet Gorion A/S v. Hyman-Michaels Company, 406 F.2d 1039 (6th Cir.1969))
 
 
 [35]
 Whisenant, 446 F.2d at 401-02; Parfait v. Jahncke Service, Inc., 484 F.2d 296 (5th Cir.1973)
 
 
 [36]
 Parfait, 484 F.2d at 304; Smith v. Brown & Root Marine Operators, Inc., 243 F.Supp. 130 (W.D.La.1965), aff'd per curiam sub nom. Underwater Services, Inc. v. Brown & Root Marine Operators, Inc., 376 F.2d 852 (5th Cir.1967)
 
 
 [37]
 See, e.g., Neville Chemical Co. v. Union Carbide Corp., 294 F.Supp. 649 (D.C.1968), aff'd in part, vacated in part, 422 F.2d 1205 (3d Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); Martinique Shoes, Inc. v. New York Progressive Wood Heel Co., 207 Pa.Super. 404, 217 A.2d 781 (1966)