Bess Caroline MOLETT, ind., Etc., et al., Plaintiffs,

v.

PENROD DRILLING COMPANY, et al., Defendants,

GEARENCH, INC., Third Party Plaintiff-Appellee,

v.

COLUMBUS–McKINNON, INC., Third Party Defendant–Appellant.

No. 90–4170.

United States Court of Appeals, Fifth Circuit.

Dec. 26, 1990.

Kenneth G. Engerrand, Houston, Tex., for third party defendant-appellant.

Jeffrey A. Rhoades, Davidson, Meaux, Sonnier & McElligott, Lafayette, La., for third party plaintiff-appellee.

Before CLARK, Chief Judge, and THORNBERRY and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:

The plaintiffs in this action entered into a settlement agreement with defendant Gearench, Inc. (Gearench). A prior decision of this court established that Gearench is entitled to indemnification from third-party defendant Columbus–McKinnon, Inc. (Columbus–McKinnon). *See Molett v. Penrod Drilling Co.,* 826 F.2d 1419, 1429 (5th Cir. 1987) (*"Molett I "*). In *Molett I,* we held that Gearench could recover the entire settlement amount from Columbus–McKinnon if the settlement was reasonable. *See id.* at 1430. We remanded the case to the district court for a determination of whether the settlement was reasonable. The district court held that it was. On a second appeal, we held that the district court lacked admiralty jurisdiction, and we remanded for a determination of whether the district court had diversity or ancillary jurisdiction. *See Molett v. Penrod Drilling Co.,* 872 F.2d 1221, 1222 (5th Cir.1989) (*"Molett II"*), cert. denied, — U.S. —, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). The district court held that it had ancillary jurisdiction over Gearench's third-party claim and reaffirmed that the settlement was reasonable. Columbus–McKinnon's third appeal to this court raises the following issues: (1) subject matter jurisdiction, (2) the reasonableness of the settlement, and (3) prejudice from failure to give notice of settlement negotiations or to timely tender defense of the suit. We affirm.

### I. Background facts and proceedings below.

On January 27, 1983, John Molett, III (Molett) and Harold E. Landry (Landry) were killed in an accidental fall while constructing the derrick on a jack-up barge owned by Penrod Drilling Company (Penrod). Penrod had contracted with Marathon LeTourneau Company (Marathon) to construct the rig at Marathon's shipyard near Vicksburg, Mississippi. The completed rig would have been too tall to pass under bridges between Vicksburg and the Gulf of Mexico. Marathon therefore towed the rig to Belle Chasse, Louisiana for final outfitting which included erection of leg sections and a derrick. Marathon subcontracted with McBroom Rig Builders, Inc. (McBroom) to erect the derrick. McBroom employed Molett and Landry.

On the day of the accident, Molett and Landry were completing construction of the top sections of the derrick. In order to lift materials to the top of the derrick, McBroom used an apparatus known as a "gin pole" which Penrod had fabricated. The forty-foot pole was equipped with pulleys and other tackle. The pole could be used as a portable stiff-leg crane by anchoring one end to the derrick and leaning the other end away from the derrick. As construction progressed, it was occasionally necessary to "jump" the gin pole farther up the derrick so that materials could be lifted higher. "Jumping the gin pole" consisted of drawing the pole upward by means of pulleys and a chain attached to the uppermost derrick beams. The base of the gin pole would be detached from the derrick, the lift executed, and the gin pole resecured at a higher level.

During the first jump on the day of the accident, Molett and Landry were standing on a scaffold 147 feet above the rig floor waiting for the gin pole to be raised. To lift the gin pole, McBroom employees wrapped a new spinning chain around the top derrick beams and attached to it a snatch block and related tackle. Two hooks had been attached to the chain, and one was inserted into the chain to secure it to the beam. The second hook was left dangling, unused, over the side of the beam. As the lift was attempted, the gin

pole suddenly broke loose and fell, hitting the scaffold on which Molett and Landry were standing. Molett and Landry and most of their equipment fell to the rig floor and both men were killed. Neither man was wearing a safety line when the accident occurred.

After the accident, McBroom employees discovered a chain still hanging from the top derrick beam, almost entirely unwound and missing one hook, and the snatch block and its tackle were found intact on the rig floor. The missing hook and any remnant of the chain that may have been attached to it were never recovered.

The survivors of Molett and Landry brought wrongful death actions against Penrod, Marathon, and other companies believed to be the manufacturers of the chain and hook used to lift the gin pole. After some time, it was discovered that the chain bore Gearench's trademark and that Kulkoni, Inc. (Kulkoni) manufactured the hook. Plaintiffs thereupon amended their complaint to name Gearench and Kulkoni as defendants guilty of manufacturing defective products. Gearench filed a third-party demand against Columbus–McKinnon contending that Columbus–McKinnon had actually manufactured the allegedly defective chain and that Gearench had not contributed to the alleged defect in any way. Gearench also contended that Penrod was at fault for failing to ensure that McBroom employees used safety lines and sought contribution from Penrod.

The case was tried to a jury. During jury deliberations, Gearench settled and agreed to pay each plaintiff family $1,000,-000. While Gearench's counsel was informing the judge that Gearench had settled, the jury announced that it had reached a verdict. The judge stated that it was his intention not to receive the jury verdict because of the settlement and that he would proceed to decide Gearench's indemnity and contribution claims against Columbus–McKinnon and Penrod. None of the parties objected. The judge discharged the jury and decided the indemnity and contribution issues after argument and briefing.

The judge found that the accident occurred because the chain suspending the gin pole broke. He also found that Columbus–McKinnon manufactured the chain and that the chain was manufactured defectively. The judge found that Gearench was unaware of the manufacturing defect. Penrod was found to owe no duty to ensure that McBroom employees wore safety lines.

The court concluded that, under either Louisiana or maritime law, Columbus–McKinnon was strictly liable for manufacturing the defective chain. The court also concluded that Gearench would have been strictly liable to the plaintiffs as a non-negligent retailer but was entitled to full indemnity for the settlement from Columbus–McKinnon under either Louisiana or maritime law.

Columbus–McKinnon appealed the district court's ruling on indemnity. This court affirmed Gearench's entitlement to indemnity, held that Louisiana law rather than maritime law governed Gearench's indemnity or contribution claims, and remanded "for specific findings on the reasonableness of the amount of the settlement." *Molett I*, 826 F.2d at 1430. On remand, the district court declared that the settlement was reasonable and assigned reasons for this conclusion.

Columbus–McKinnon's second appeal argued that the settlement was unreasonable and that the district court lacked subject matter jurisdiction. Plaintiffs had originally pleaded admiralty and diversity jurisdiction, but *Molett I* established that maritime law did not govern Gearench's indemnity or contribution claims. This court held that the district court lacked admiralty jurisdiction over the plaintiffs' claims, but remanded for consideration of whether diversity jurisdiction was present because the allegations of diversity in the plaintiffs' complaint were defective. *See Molett II*, 872 F.2d at 1228–29. In *Molett II*, we indicated that jurisdiction could be established in either of two ways. First, diversity jurisdiction would exist if Gearench and Columbus–McKinnon were diverse. Second, ancillary jurisdiction would exist if the parties

to the original action were diverse. *See id.* at 1227.

On remand, Gearench amended its third party demand and alleged facts to show that the parties to the original action were diverse. The district court accepted Gearench's proof, held that it had ancillary jurisdiction over Gearench's claims against Columbus–McKinnon, and reinstated its indemnity award. Columbus–McKinnon again appeals.

## II. Issues.

### A. Jurisdiction.

Plaintiffs' complaint alleged both admiralty and diversity jurisdiction. In the pretrial order, the parties stipulated that jurisdiction was based on general maritime law with pendent state claims. All parties proceeded to trial under the assumption that the district court had admiralty jurisdiction. Plaintiffs settled all of their claims with defendants before the trial ended. Not until this court's holding in *Molett II* was the district court's lack of admiralty jurisdiction over plaintiffs' claims established. *Molett II* also held that the diversity allegations in plaintiffs' complaint were technically deficient because they did not identify the defendant corporations' states of incorporation or principal places of business. Columbus–McKinnon argues that the district court lacked ancillary jurisdiction over Gearench's third-party action because the original action was dismissed with prejudice before jurisdiction was proved.

■ On remand from *Molett II*, Gearench established that the parties to the original complaint were diverse. Columbus–McKinnon does not dispute this fact. It is well settled in this circuit that a federal district court may consider ancillary cross claims after disposing of a main claim within its jurisdiction. *See IMFC Professional Servs. of Florida, Inc. v. Latin Am. Home Health, Inc.*, 676 F.2d 152, 159 (5th Cir. Unit B May 1982).

■ Columbus–McKinnon maintains, however, that plaintiffs' claims cannot support ancillary jurisdiction because plaintiffs did not prove subject matter jurisdiction

before the settlement and dismissal. Thus, Columbus–McKinnon concedes that the parties were actually diverse, but argues that the failure to correct the technical defect in plaintiffs' diversity allegations before dismissal prevents the district court from hearing Gearench's third-party claim. We disagree.

■ It is true that an ancillary claim must be dismissed "as never having been within the court's jurisdiction" if the principal claim is dismissed because "there was never jurisdiction over it." *IMFC*, 676 F.2d at 159 n. 12. In this case, however, plaintiffs' complaint was not dismissed for lack of jurisdiction. In fact, jurisdiction was not seriously contested until after the district court accepted the settlement and dismissed plaintiffs' claims. *See Molett II*, 872 F.2d at 1228. By statute, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653. Congress so provided in order to avoid dismissals because of technically deficient jurisdictional allegations. *See Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, ——, 109 S.Ct. 2218, 2222, 104 L.Ed.2d 893 (1989).

After *Molett II*, Gearench amended its Third–Party Demand to show that the parties to the original action were diverse and that the district court had ancillary jurisdiction over Gearench's third-party claims. Gearench's amended third-party demand therefore establishes ancillary jurisdiction despite the fact that plaintiffs' diversity allegations were technically defective at the time of dismissal.

### B. Standard of review.

■ On remand from *Molett I*, the district court concluded that the settlement was reasonable. The bases of this conclusion were: (1) the findings approved by this court in *Molett I* to the effect that Columbus–McKinnon manufactured the chain, the chain was defective, the defect caused the chain to break, Gearench did not abuse the chain, and Gearench had no knowledge of the defect, (2) the effectiveness of the evidence and the attorneys, (3) plaintiffs' high damage figures on lost wages, (4) the likely

awards for loss of consortium, and (5) a finding that Gearench's potential liability would have been substantial even after a reduction for plaintiffs' and McBroom's alleged contributory negligence. The clearly erroneous standard of review applies to the district court's findings. *See Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 305 (5th Cir.1973), *cert. denied*, 415 U.S. 957, 94 S.Ct. 1985, 39 L.Ed.2d 572 (1974).

Columbus–McKinnon argues that a lesser standard should govern this appeal because the district court did not determine that the settlement was reasonable immediately after the trial. Columbus–McKinnon cites *Bull's Corner Restaurant v. Director of the Fed. Emergency Management Agency*, 759 F.2d 500 (5th Cir.1985), for the proposition that a lesser standard applies "when findings of fact are based on a cold record." Appellant's brief at 15. In *Bull's Corner*, we noted that the degree of deference to a district court's fact findings is lower when the case is submitted entirely on documents rather than live testimony. *Bull's Corner*, 759 F.2d at 502. We nevertheless held that the clearly erroneous standard of Fed.R.Civ.P. 52 applies to both situations. *Id.* at 502–03. We did not hold that the degree of deference is lower when the district court does not make findings immediately after the trial. Moreover, in today's case, the district judge who saw and heard live testimony did not rely entirely on documents.

Columbus–McKinnon also argues that the de novo standard should apply because the district court's findings are insufficiently detailed. Columbus–McKinnon cites *United States v. Wiring, Inc.*, 646 F.2d 1037, 1041 (5th Cir. Unit B June 1981), for the proposition that the clearly erroneous standard only applies to findings of "subsidiary" facts whereas the de novo standard applies to findings of "ultimate" facts. Columbus–McKinnon maintains that the district court's allegedly insufficiently detailed memorandum ruling simply announced a finding of an "ultimate" fact—that the settlement was reasonable—without including findings of "subsidiary" facts. Columbus–McKinnon's argument is misplaced for two reasons. First, the district court's findings are sufficiently detailed because they afford "a reviewing court a clear understanding of the factual basis for the ... decision." *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir.1985). Second, following the Supreme Court's decision in *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), this circuit has consistently held that the clearly erroneous standard applies to findings of "ultimate" as well as "subsidiary" facts. *See, e.g., Chescheir v. Liberty Mutual Ins. Co.*, 713 F.2d 1142, 1149 (5th Cir.1983) ("Under *Pullman–Standard* ... unless that ultimate finding is clearly erroneous, we must affirm the legal conclusion of liability."). The clearly erroneous standard therefore applies to the district court's ultimate finding on the reasonableness of the settlement amount as well as to the subsidiary findings that form the basis of that ultimate finding.

Finally, Columbus–McKinnon argues that the district court ignored this court's mandate by failing to make specific findings relating to the reasonableness of the settlement. In *Molett I*, we held that the district court's original fact findings were sufficient to establish Columbus–McKinnon's duty to indemnify Gearench. *See Molett I*, 826 F.2d at 1429. We also held that Columbus–McKinnon was only required to fully indemnify Gearench for the entire settlement amount if the settlement was reasonable. *See id.* at 1429–30. We explained that the district court's fact findings on actual liability did not address the reasonableness of the settlement because that "question involves not only the proof of liability and the amount of damages sustained but also the extent to which the failure of Molett and Landry to wear safety belts, and of McBroom to ensure that belts were worn, contributed to the men's deaths." *Id.* at 1430. Columbus–McKinnon contends that the quoted language represents a direction to the district court to make specific and detailed fact findings on the identified issues. Columbus–McKinnon suggests that we should make our own fact findings. The quoted language, how-

ever, merely explains our decision to remand this case. As in any other appeal, the district court's ruling is only required to be sufficiently detailed to afford this court a clear understanding of the factual bases of the decision.

We review both the subsidiary and ultimate fact findings under the clearly erroneous standard.

## C. Reasonableness of the settlement.

■ Columbus–McKinnon attacks the district court's conclusion that the settlement amount was reasonable on numerous grounds. Ultimately, however, a decision on whether a settlement amount is reasonable involves an overall evaluation of "the extent of financial exposure the settling party faces ... if [the party] does not settle." *Mathiesen v. Panama Canal Co.*, 551 F.2d 954, 957 (5th Cir.1977). In this case, Gearench settled after the parties had fully presented the case to the jury. The jury did not render a verdict because the trial judge discharged the jurors after the parties announced the settlement. The trial judge then became the fact finder on the third-party claims. The reasonableness of the settlement must be assessed in light of Gearench's financial exposure at the conclusion of the full trial on the merits. The trial judge was in a unique position to evaluate the competing claims, the evidence, the effectiveness of the advocacy, and the jury's reactions. This is especially true in today's case. The reasonableness inquiry is usually fact intensive and can be legally complex.

Columbus–McKinnon initially attacks the district court's implicit reaffirmation of its initial findings on Gearench's potential liability to the plaintiffs. Columbus–McKinnon contends that Gearench's financial exposure was low because the evidence introduced at trial was insufficient to support causation and defectiveness. Columbus–McKinnon argues that the evidence established that: (1) the chain had a rated capacity of 12,500 pounds and the gin pole weighed 1200 pounds, (2) a weight-bearing portion of the chain did not fail, (3) other things besides a chain defect might have caused the accident, (4) Columbus–McKinnon tests each link in its chains at 6500 pounds before sale, and (5) the remnant that allegedly broke was subsequently tested up to 15,000 pounds.

In *Molett I*, we noted that evidence established that: (1) the chain measured 18 1/2 feet after the accident whereas Columbus–McKinnon sold chain in standard lengths of 18 and 20 feet with insignificant variations, (2) the accident occurred while the chain was in normal use, (3) experts believed that chain or hook failure were the most likely causes, (4) hook failure was highly unlikely because testing revealed that a fragment of a broken hook would have been found attached to the chain if only the hook had broken, (5) testing revealed that the chemistry of the chain varied beyond tolerances for the type of steel used, (6) the chain remnant found after the accident contained a misshapen link that quality control inspectors should have rejected, and (7) although Columbus–McKinnon claimed to have tested every chain at heavy weights, Columbus–McKinnon's practice was to replace defective segments with new material which created a likelihood that some material left the factory untested. *See Molett I*, 826 F.2d at 1425. We therefore held that the district court's findings that the chain was defective and that the defect caused the accident were not clearly erroneous. *See id.*

The law of this case has already established that the district court's initial findings that the chain was defective and that the defect caused the accident were not clearly erroneous. The reasons supporting this holding in *Molett I* also defeat Columbus–McKinnon's argument that the settlement was unreasonable because the evidence on causation and defectiveness was weak. Additionally, the fact that the trial judge correctly held that the chain was defective and that the defect caused the accident suggests that the jury would have done the same. Thus, we now hold that the district court's implicit finding that the jury would have found causation and defectiveness is not clearly erroneous.

Columbus–McKinnon next argues that the settlement amount was not reasonable because of Molett's and Landry's failure to wear safety lines. Columbus–McKinnon contends that Molett and Landry would not have fallen to their deaths if they had worn safety lines and that failure to wear safety lines constituted negligence which reduced Gearench's financial exposure. Columbus–McKinnon also points out that *Molett I* recognized that state, federal, and company safety regulations require rig builders to wear safety lines. *See id.* at 1422.

Gearench argues that the evidence established that rig builders refuse to wear safety lines and employers refuse to enforce the safety regulations because safety lines significantly restrict mobility. Trial testimony established that it is often impractical to wear safety lines because of their effect on mobility. McBroom's foreman, Tommy Welsh, testified that a job that would take five to six days to complete without safety lines might take twenty days with them. Testimony also indicated that safety lines pose a tripping hazard on a busy rig and that rig builders fear that the lines may trap them under certain circumstances. McBroom's president testified that he distributed safety lines to Welsh even though he knew that Welsh did not enforce their use and was opposed to them. The evidence was unclear as to whether Welsh actually brought safety lines to the job site on the day of the accident. Thus, it is possible that safety lines were not available to Molett and Landry on that day.

The district court found that the jury would not have been impressed with the comparative negligence arguments presented at trial and that Gearench faced substantial financial risk even after a possible reduction for plaintiffs' comparative negligence.

Columbus–McKinnon argues that federal and Louisiana case law mandate a high percentage of comparative fault for failure to use safety devices. All of the cases cited by Columbus–McKinnon involve unique facts and comparative fault assessments by the fact finder. In today's case,

the experienced trial judge, who became the fact finder on the third-party claims, concluded that the jury would not have found a high degree of comparative fault attributable to Molett and Landry. That conclusion was not clearly erroneous.

Columbus–McKinnon also argues that standard industry practice is not necessarily due care and that Molett's and Landry's comparative negligence is shown by their violation of state, federal, and company regulations. The district court did not state that Molett and Landry were not negligent. The district court merely found that if the jury determined that Molett and Landry were guilty of negligence which contributed to their deaths, the jury would have found that their negligence was slight. Under the circumstances, the district court's finding on comparative negligence by Molett and Landry is not clearly erroneous.

Columbus–McKinnon next argues that the settlement amount was not reasonable because of McBroom's failure to ensure that its employees wore safety lines. Columbus–McKinnon contends that McBroom's comparative negligence reduced Gearench's financial exposure. Under Louisiana law at the time of trial, however, an employer's negligence did not reduce an employee's recovery against a third party. *See Franklin v. Oilfield Heavy Haulers*, 478 So.2d 549, 556–57 (La. App. 3rd Cir.1985), *writs denied*, 481 So.2d 1330, 1331 (La.1986). As a solidary obligor, Gearench would have been liable to the plaintiffs for the entire amount of the damages after a reduction for Molett's and Landry's percentages of comparative fault. *See* La.Civ.Code Ann. art. 2324 (West 1979), *as amended by* 1979 La. Acts 431, § 1. McBroom's percentage of comparative fault would not have reduced the plaintiffs' recovery from Gearench and should not be considered in determining whether the settlement amount was reasonable.

Columbus–McKinnon cites several cases for the proposition that "the fault of the employer must also be submitted to the jury to reduce the Plaintiffs' damage award." Appellant's brief at 30. The cited cases indicate that an employers' negligence may be submitted to the jury. They

also hold that the employer's comparative negligence does not reduce the employee's recovery from third parties unless the employee's percentage of fault exceeds the third party's percentage of fault. *See Nance v. Gulf Oil Corp.*, 817 F.2d 1176, 1180–81 (5th Cir.1987); *Savoie v. McCall's Boat Rentals, Inc.*, 491 So.2d 94, 105 (La. App. 3rd Cir.1986), *writs denied*, 494 So.2d 334, 542 (La.1986); *Trosclair v. Terrebonne Parish School Bd.*, 489 So.2d 1293, 1298 (La.App. 1st Cir.1986), *writs denied*, 493 So.2d 644, 647 (La.1986). The district court's finding that McBroom's comparative negligence would not have significantly reduced Gearench's financial exposure is not clearly erroneous.

Finally, Columbus–McKinnon argues that the settlement amount of $1,000,000 per plaintiff family was excessive considering the likely damage awards. The district court noted that plaintiffs' damage estimates were as high as $1,250,000 per family for lost wages and that loss-of-consortium awards might have been very high. Columbus–McKinnon argues that plaintiffs' pecuniary damages figures were inflated because plaintiffs' expert assumed that Molett and Landry would earn their 1982 salary each year for the rest of their lives. Columbus–McKinnon notes that Molett and Landry died before the oil bust and contends that the men would have earned less during periods of low demand for rig building. Columbus–McKinnon also argues that other rig builders earned much less after 1982 and that a more accurate estimate of lost future earnings would be approximately $500,000 per family.

Gearench responds that the battle of the experts turns on credibility and that plaintiffs' experts were more credible. The record specifically reflects that the defendants' economist admitted having made at least four computational errors. Gearench argues that the oil industry is cyclical and unpredictable, that the record reflects that rig builders could supplement their incomes with steel work on land, and that Gearench risked having the jury accept plaintiffs' large figures. In addition, Gearench maintains that plaintiffs would have been entitled to prejudgment interest of approximately 35 percent for the three years between the filing of the complaint and the settlement.

As for non-pecuniary losses, Columbus–McKinnon argues that this court has established a $250,000 cap for awards to spouses. Columbus–McKinnon therefore maintains that $250,000 per plaintiff family is an appropriate maximum figure. In *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778 (5th Cir.1983), the case cited by Columbus–McKinnon, we stated: *"[O]n the record in this case*, we consider the sum of $250,000 to be the maximum award that could be allowed for the emotional losses arising from the death of Mrs. Caldarera, apart from the economic loss." *Id.* at 785 (emphasis added). *Caldarera* did not establish a liability cap for non-pecuniary damages for the loss of a spouse. As the district court correctly noted, this circuit will not upset a jury award for non-pecuniary losses absent a strong showing of excessiveness. In *Caldarera*, we stated: "Because the assessment of damages for grief and emotional distress is so dependent on the facts and is so largely a matter of judgment, we are chary of substituting our views for those of the trial judge.... We have expressed the extent of distortion that warrants intervention by requiring that such awards be so large as to 'shock the judicial conscience'...." *Id.* at 783. Gearench also points out that in *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 920–21 (5th Cir.1987), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988), this court allowed a jury award of $500,000 for non-pecuniary losses to stand.

Finally, Columbus–McKinnon argues that $100,000 approximates the maximum amount of non-pecuniary damages recoverable by a decedent's minor child. Columbus–McKinnon cites *Farlow v. Roddy*, 478 So.2d 953 (La.App. 5th Cir.1985), *aff'd* 493 So.2d 592 (La.1986), in which the Louisiana Court of Appeals remarked that the trial court's non-pecuniary damage award, including $100,000 for each of the decedent's minor children, was "very high." *Id.* at 963. Columbus–McKinnon also cites *Thomas v. State Farm Ins. Co.*, 499 So.2d 562 (La.App. 2nd Cir.1986), *writs denied*, 501 So.2d 213, 215 (La.1987), in which the

Louisiana Court of Appeals reduced a minor child's non-pecuniary damages award from $300,000 to $100,000. *See id.* at 566–67.

Gearench points out that in *Marks v. Pan American World Airways, Inc.*, 785 F.2d 539, 541 (5th Cir.1986), we held that an award of $250,000 per child per parent was not excessive under Louisiana law. Additionally, in *Hellmers v. Department of Transp. and Dev.*, 503 So.2d 174, 179 (La. App. 4th Cir.1987), *writs denied*, 505 So.2d 1141, 1149 (La.1987), the Louisiana Court of Appeals held that non-pecuniary damages of $250,000 per child were not excessive.

Assuming maximum non-pecuniary awards of $250,000 for spouses and $100,-000 for minor children, Columbus–McKinnon calculates that the maximum amount awardable to both families was approximately $1,788,492. Assuming prejudgment interest of 35 percent and maximum non-pecuniary awards of $500,000 for spouses and $250,000 for minor children, Gearench calculates that its financial exposure was approximately $4,993,650.

The sharp differences in the parties' suppositions and contentions demonstrate that, in today's case, it is impossible to fix a reasonable settlement amount with anything approaching mathematical precision. For example, the parties' estimates of maximum damages vary by over $3,000,000. The calculation of a reasonable settlement amount necessarily must be resolved by an exercise in judgment. We have held that the district court's fact findings were not clearly erroneous. Those findings form the principal bases of the finding that the settlement amount was reasonable. The district court was particularly well-situated to make the ultimate determination that the settlement amount was reasonable. That determination was not clearly erroneous.

### D. Prejudice.

■ Gearench tendered defense of the action to Columbus–McKinnon while the jury was deliberating and did not inform Columbus–McKinnon of the settlement negotiations. In *Molett I,* we held that a settling indemnitee who fails either to inform the indemnitor of settlement negotiations or to tender defense of the suit to the indemnitor cannot recover full indemnity for the settlement amount if the failure to take either of these two steps prejudiced the indemnitor. *See Molett I,* 826 F.2d at 1429.

Molett and Landry died on January 27, 1983. The plaintiffs filed suit against Penrod, Marathon, and Armco Steel on July 14, 1983. The plaintiffs did not name Gearench as a third-party defendant until February 10, 1984. Gearench did not plead or argue that Louisiana's one year prescription statute applicable to tort actions, La. Civ.Code Ann. art. 3492 (West Supp.1990), barred plaintiffs claims against it even though plaintiffs named Gearench as a defendant more than one year after the cause of action accrued. Columbus–McKinnon argues that Gearench's failure to raise prescription under Louisiana law as a complete defense to plaintiff's claims was prejudicial. We disagree.

In its answer to Gearench's third-party demand, Columbus–McKinnon could have raised prescription as a complete defense to its derivative liability to Gearench. Gearench's failure to raise prescription did not prevent Columbus–McKinnon from availing itself of the defense, yet Columbus–McKinnon failed to do so. None of the parties considered prescription to be a viable defense until long after the settlement. The reasons are apparent. First, at the time of settlement all parties were proceeding on the assumptions that federal maritime law governed the action and that the applicable limitations period was three years. *See* 46 U.S.C.App. § 763a. This remained so until *Molett I*'s holding that federal maritime law did not apply. Second, under Louisiana law, Gearench would not have a viable one year prescription defense if the negligence claims against Penrod were valid. Under Louisiana law, "[t]he interruption of prescription against one solidary obligor is effective against all solidary obligors...." La.Civ.Code Ann. art. 1799 (West 1987). The timely-filed claim against Penrod would have interrupted the prescription period for plaintiffs' claims against Gearench unless Penrod was found to be not negligent. This possibility remained viable until

the district court absolved Penrod following argument on the third-party claims. The possibility of prescription under Louisiana law only became apparent in the bright light of hindsight lit by the district court's original decision on the third-party claims and this court's decision in *Molett I.* Columbus–McKinnon had the opportunity to raise the defense in its own right but failed to do so because Columbus–McKinnon had no more foresight than Gearench. Columbus–McKinnon was not prejudiced by Gearench's delay in tendering the defense of the suit or by Gearench's failure to notify Columbus–McKinnon of the settlement negotiations.

### III. Conclusion.

The decision of the district court is AFFIRMED.