IRWIN v. UNITED STATES et al.

No. A 19221.

United States District Court
E. D. New York.

April 29, 1953.

Bertram J. Dembo, New York City, Jacob Rassner, New York City, for libelant.

Haight, Deming, Gardner, Poor & Havens, New York City, Frank J. Parker, U. S. Atty., Brooklyn, N. Y., J. Ward O'Neill, New York City, for respondent.

Kirlin, Campbell & Keating, New York City, Raymond Parmer, New York City, for respondent-impleaded.

BYERS, District Judge.

This is an admiralty cause in which the libelant seeks recovery because of personal injury suffered by him on January 26, 1949, while he was assistant surgeon on the passenger steamship Marine Perch (to be called the Perch), owned by the United States and operated by American Export Lines, Inc., as agent.

A motor lifeboat No. 4 on the port side was being launched from the Perch for the purpose of removing an injured mate of the Greek ship Nicholaou Maria (to be called the Maria) and bringing him aboard the former so that he might be under the care of a ship's surgeon, with which the Greek ship was not manned.

The Maria had communicated by radio with the United States Coast Guard to report an injury suffered by her mate, and to ask for advice, since he was suffering from an apparent brain injury as the result of his falling to the deck of his ship and striking his head. The Coast Guard instructed the Perch as the nearest available ship to proceed to a meeting place with the Maria which was accomplished in a few hours (latitude 32.14N, longitude 38.32W), in the general vicinity of the Azores, early in the morning of the day in question. This was

not less than 1,000 miles east of the Gulf Stream, contrary to libelant's contention on that subject.

The Maria seasonably requested the Perch to send her own motor lifeboat rather than use the former's ordinary lifeboat, and that request was acceded to; the Perch's lifeboat was put overside at about 3:18 A.M. GMT, and it was that operation which resulted in the injury to the libelant, who was present in the boat along with the ship's surgeon, but why two medical officers were required has not been made clear.

At that time the two ships were a distance of not less than one-half mile or more than one and one-half miles apart and their relative positions and headings are shown on U. S. Exhibit 5.

The libelant's cause as asserted is based upon:

(a) Alleged unseaworthiness of the Perch in the matter of the failure and neglect of the respondent to keep the Perch and its appurtenances in a seaworthy condition and a reasonable state of repair. This refers to the davits and lowering gear of lifeboat No. 4, port side; and

(b) Negligence in the conduct of the lowering operation and a delay in returning the libelant to the ship immediately following his sustaining the injury in question.

The second cause is for maintenance and cure, as to which only the amount of the award requires consideration.

The owner of the Maria was brought in by the respondent under the Admiralty Rule 56, 28 U.S.C.A., and the petition asserts negligence on the part of the Maria in connection with the injury to the mate, and failure to maintain the ship in a seaworthy condition as the result of which the impleaded-respondent is asserted to have agreed to indemnify the respondent in connection with the incidents of the service which the latter rendered in taking the mate of the Maria on board the Perch.

The question of unseaworthiness of the Perch has probably been abandoned but it will be briefly treated in the findings for the sake of completeness. The only material controversy is over the way in which the operation of lowering the boat was conducted, and criticism of her failure to return to the Perch immediately upon discovery that one or more of the occupants of the lifeboat had suffered injury in consequence of improper handling, as alleged, of the operation. That aspect of the controversy will be made the subject of findings, and in connection therewith explanatory comments will be offered.

### Findings.

1. At 3:18 A.M. GMT, these vessels were substantially in the position shown in U. S. Exhibit 5, the wind being out of the NNE of a force 2 on the Beaufort scale, and in those headings the port side of each vessel was the lee side.

2. During the ensuing five hours the direction of the wind did not materially change, but the force gradually rose to about 5 at 8:00 A.M.

### Comment:

This finding is based on such conflict in the testimony as is shown in a comparison of U. S. Exhibit 5 and Libelant's Exhibit 1, being the sketch accompanying the deposition of Costas Mitropoulos who was the master of the Maria (Taken November 26, 1952, 2 years and 11 months after the event). The former exhibit is preferred because it is the testimony of this witness that when the launching of the lifeboat from the Perch took place it was from the windward side, which is not only contradicted by all who had charge of that operation, but is also opposed to the plainest teachings of common sense; moreover, since this witness' post of observation was not less than a half a mile distant from the Perch, and the operation was conducted in the darkness (although the Perch was using floodlights), that particular aspect of his testimony cannot be accepted.

3. At about 3:18 A.M. GMT, motor lifeboat No. 4 on the port side of the Perch, having been in all respects properly equipped and manned, was lowered on the lee side of the ship as the first step in undertaking the transportation from the Maria to the Perch of the injured mate of the former. This was pursuant to an arrangement

between the masters of the two ships reached through an interchange of radio communications.

4. The lifeboat was in command of the witness Walsh, who has held a master's license for twelve years and who was chief officer of the Perch. A volunteer crew of 13 manned the boat, among whom were Marken, first assistant engineer of the Perch (a witness), the junior third mate Andresen, the ship's surgeon Goehausen (a witness), and the libelant Irwin (also a witness), who as stated was assistant ship's surgeon.

5. This lifeboat was carried at the level of the boat deck in the new type Welin gravity type davits, and at the inception of the lowering operation both davits were in all respects in good operating condition.

6. The mechanical operation of lowering involved the following:

(a) The arms of the davits swung out clear of the ship's side, and the lifeboat descended to the level of the boat deck, where the lockbar was manually removed by the second officer, at which time some of the crew were in the boat;

(b) Then the second officer released the brake to lower the boat to the A deck where the remainder of the crew entered the lifeboat;

(c) The lowering thereafter continued, the boat being in a level position, until it was within from one to two feet of the surface of the water;

(d) The lowering was completed as hereinafter stated, without damage to either fore or aft ring bolt attached to the davits, or either fall.

### Comment:

The foregoing reflects a choice between the testimony of the libelant's witness Lashewitz, whose deposition was taken May 24, 1952, over three years after the happening, and the oral testimony of Redmond, the master of the Perch, Walsh, the first officer, and Marken, the first assistant engineer.

Lashewitz, who was the chief electrician of the Perch, had charge of the floodlights which were turned on in aid of the launch-ing of the lifeboat. He stood by No. 4 as it was launched and continued on deck throughout the night and until the ultimate return of that lifeboat with the patient from the Maria. He described the launching above referred to, the personnel in the boat, the lowering, and the operation of the re-lease gear (later to be stated). A comparison between the opening statement of libelant's counsel and the testimony of Lashewitz reveals a possible difference on the subject of which ring bolt according to Lashewitz broke, in the final stage of the lowering operation; but whether there is such a conflict or not is unimportant since I am satisfied that no such breaking took place until many hours later when the lifeboat returned from the Maria and the effort was made to hoist it on board; that effort proved to be unsuccessful because at that time, due to a bent davit and the impact of a heavy swell, the forward ring bolt was broken. An additional reason for viewing Lashewitz' testimony somewhat askance is that he had two personal claims pending against the American Export Lines when testifying.

7. While so suspended (Finding 6-c), a swell struck the lifeboat near its bow, raised it and caused it to strike against the hull of the Perch; the stern being lower than the bow at that instant, the boat in settling upon the water suffered what is described as a sudden jerk, which threw several of the occupants about, and the chief surgeon Goehausen was actually thrown overboard. The libelant was tossed from one side of the boat to the other and thereby sustained injuries to his left shoulder, arm and left side, which constitute the basis of his claim in this cause.

8. As the lifeboat became waterborne, the mate gave the order to release the falls, which was speedily accomplished, and the boat being then all clear of her rigging, the motor—which had been operating in neutral during the descent—was put in gear and movement away from the side of the ship promptly ensued.

9. Good seamanship required that the lifeboat be moved away from the side of the Perch at once.

10. At about the time that the lowering operation started, the wind was out of the NNE, Force 2, and during the ensuing five hours it gradually increased to Force 4 or perhaps 5. There was a swell in the sea during the entire time, which took effect on the starboard side of both vessels, but during the interval the condition which prevailed could not be accurately described as that of a heavy sea.

### Comment:

It is true that the log of the Perch which contains an entry concerning this happening reads as follows:

"While lowering boat, bow of boat hit vessel's side as a result of heavy sea hitting boat."

Both Captain Redmond, who observed what was taking place from the bridge of his ship, and chief officer Walsh, who was in command of the lifeboat and who made the log entry, say that the latter is not accurate, and that the word "sea" should have been "swell." That testimony is accepted for the reason that it nowhere appears that there was any hesitancy in putting the lifeboat overside by reason of the condition of the sea, nor was an oil slick ordered which would have been appropriate to such conditions. Also U. S. Exhibit 9 is a photograph taken from the lifeboat as it approached the Maria, which was at about 8:00 o'clock A.M., and that clearly indicates a calm sea. Finally, under cross-examination Walsh, the first officer, testified that no waves from ten to fifteen feet high were running and that he noticed no swell before lowering the lifeboat and that the one that did hit he would definitely term "a freak swell" (by which I understand he means, oversized).

One reason for accepting his testimony was his experience in the United States Navy in the amphibious force during the war, which involved as his primary duty the lowering of boats.

11. While the lifeboat was still near to the Perch and after the chief surgeon had been hauled back into the boat, he made a prompt examination of all occupants who were injured; while still within hailing distance, chief officer Walsh reported the fact that there were injured men in the boat, and that he would return to the ship with them before completing his mission to the Maria.

He accomplished that purpose after an interval variously estimated of from two to three hours because he preferred to cause the men to be removed from the lifeboat and placed on the ship in daylight hours. The libelant was placed in a stretcher carried on the lifeboat, and hoisted aboard the Perch and the other injured men were also drawn aboard by the use of ropes. Thus there was an interval of time of approximately three hours between the injury suffered by the libelant and his being received back on board the Perch where his immediate necessities were ministered to in the ship's bay.

12. The failure of first officer Walsh to return to the Perch at once for the purpose of making it possible for the libelant and the other injured men to be received on board for medical treatment has not been shown to have contributed to the severity, or prolonged effect of the libelant's injuries.

### Comment:

No one disputes proper handling of the boat required that as soon as she should be waterborne she should at once proceed away from the side of the Perch, but it is argued, and with reason, that as soon as Walsh learned that some of his crew were injured he should have taken all measures for their safety before proceeding to the Maria; indeed, Captain Redmond's testimony is directly to that effect. It therefore becomes necessary to analyze the evidence in the effort to determine whether Walsh's decision to await daylight before transferring the injured men is to be criticized as having fallen short of the standard of judgment that he was required to exercise.

The precise injury suffered by the libelant was described by the witness, Dr. Michele, an orthopedic surgeon attached to the Marine Hospital, Staten Island, who examined and treated the libelant from the period of his reception at the Hospital on January 31, 1949 until April 14, 1949 when he made a record of the examination. He said that the x-rays taken at the time of admission had shown a fracture through the surgical neck of the humerus and posterior angulation of the distal fragments and impaction

of the fracture site, and there was fairly good alignment. X-rays taken March 9, 1949 showed a beginning amount of callus over the fracture site, and those taken April 4, 1949 showed an increase in the amount of callus; as a result of the examination of April 14, the doctor said that it was his opinion that the patient presented a disability of the left upper extremity and would require further medical care for a period of about three or four months.

It is a fair inference that there was a relationship between the fracture and the conditions observed by Dr. Gould, a friend of the libelant, who observed after the libelant had left the hospital, that there was a paralysis of the ulna nerve in the left hand, limitation of motion, loss of sensation, and inability to use the hand and arm adequately, wherefore he advised the libelant "to continue movements of the arm, to exercise it, to massage it by himself, to keep the fingers moving, and to keep them from getting stiff."

On the eve of the trial he made an examination and his testimony is quoted:

"He still shows evidence of involvement of the left ulnar nerve, with weakness of the fine movements of the hand. The coarse movements are fairly well performed, but the functions of the coarser movements are taken over by other nerves and other muscles, but the functions of the ulnar nerve, namely, the fine, delicate movements of the hand are still done very poorly. There is still a disturbance of sensation of the ulnar distribution. This is a definite organic change which is present, and which, if it has not cleared up by now will be permanent.

"In addition to that he has a complete loss of confidence as to his ability to use that hand and, being left-handed, he is definitely handicapped because of that lack of facility of motion, and with the loss of confidence, and the depression which has set in because of this condition the prognosis is very poor."

No one ventures the opinion that a delay in the initial attempts to reduce the fracture resulting from the lapse of two to three hours while the libelant was in the lifeboat caused an aggravation of the fracture, or adversely altered the effect that the fracture may have had upon the nerve structure of libelant's left shoulder.

Goehausen testified to the professional attention that he gave to the libelant in the lifeboat. That examination disclosed a very obvious deformity of his right shoulder and right upper arm, and an obvious fracture and even a possible dislocation of the shoulder.

Of course Goehausen was in error in referring to the right shoulder as he did twice in his testimony, which would be unimportant if it did not appear that in other respects his memory was less than accurate.

There were two others who seemed to have fractured legs and nearly everyone was bruised and cut. He said that he did not have the equipment in the boat with which to treat the injured men and that there were no splints available, or morphine.

Walsh testified that Goehausen had said to him that none of the men was seriously injured, and this statement Goehausen denied. He testified: "I told him that Dr. Irwin certainly had a broken arm, and that two other—the two other men possibly had broken legs. That is what I told him." That he did not discuss with Walsh the treatment that he was capable of administering in the lifeboat other than that he could not do much there. That he was not able to reduce the dislocation of the shoulder of Dr. Irwin in the lifeboat nor did he administer medication, although the presence of moderate shock was observed, for which he did not attempt treatment: "I didn't have anything to use other than to make him comfortable, lay him down and get his arms placed in a position so that the fracture would not be worsened by movements, and so forth." Later: "* * * we fastened the arm within his coat to keep that in place. We laid him down in a semi-reclining position, and we covered him with

somebody's coat if I recall correctly. That is about all we could do there."

He proceeded to treat the libelant as soon as the latter was removed via the stretcher to the Perch, on which occasion he found an obvious distortion of the normal anatomy of the shoulder and it was his impression that the libelant had a surgical fracture of the neck of the humerus and a dislocated shoulder. "I attempted to reduce the dislocated shoulder immediately but I was unsuccessful in doing so. And then I treated the fracture of the surgical neck of the humerus." He said that the condition of the soft tissue about the shoulder joint was swollen and that "the swelling always impairs the reduction of a fracture or even of a joint, or a fracture." And that the swelling reaches its peak in about two or three hours after a happening.

As to the effect of the delay, he said that the swelling always interferes with the reduction of a dislocated shoulder as stated, and that if there had been a successful reduction "shortly after the accident" the end result would have been changed, that is, "if the shoulder is reduced the joint then is put in a normal anatomical position and the function then can be resumed."

There is no testimony to the effect that the dislocation had any relation to the nerve involvement, nor that the fracture to which the nerve condition could have been plausibly traced, resulted from the inability to reduce the fracture at once. Also the testimony of Goehausen is devoid of a showing that the libelant's condition impressed him as being so serious as soon as he made his cursory examination, that he requested Walsh to return to the Perch without delay in order that the libelant and other injured men might be treated at once.

Thus the decision of Walsh to await daylight in order that the transfer back to the ship might be safely handled, cannot be criticized as opposed to the obvious requirements of the situation as he saw it.

He was asked on cross-examination why immediately upon discovering that men had been injured, he did not order the lifeboat back to the ship so that it could be hoisted on board, and his answer is as follows:

"I never gave the order to hoist the lifeboat back onto the mother ship for the simple reason that I had injured men on the boat, and I had a boat full of men, and if I would have pulled that boat out of the water, regardless of the conditions, even under perfect conditions, a lifeboat when she gets out of the water and gets into the air, she has a tendency to swing, and if she swung and hit the ship's side, I would have dumped people overboard."

Moreover, there is no expert testimony by the witness Dixon called by the libelant, directed to the proposition that under the conditions of wind and sea prevailing, Walsh did not bring to bear the requisite skill of his calling by failing to return to the Perch sooner than he did; nor does the evidence as a whole justify one, who is untutored in the handling of small boats put overside from a large ship under the conditions of wind and sea here involved, in offering a criticism of Walsh's handling of a perplexing situation. No argument is made for the libelant that the ship should be criticized because Goehausen did not request Walsh to return to the ship at once so that the libelant could be promptly treated in the ship's bay, and he did not say as a witness that he deemed that to be his duty.

13. In due course the injured mate of the Maria was taken into the lifeboat of the Perch and brought aboard the latter by the use of a stretcher, and thereafter when the effort was made to hoist the lifeboat back into her position, that was found impossible of accomplishment because again a sea interfered and caused her bow to fall so suddenly that the ring bolt on the forward davit was broken, and to avoid the delay thus occasioned, Captain Redmond ordered that the lifeboat be abandoned.

Comment:

It is believed that it was the happening referred to in the foregoing finding that accounts for the testimony of Lashewitz which has been discussed, and the confu-

sion in his memory between what happened when the lifeboat was launched, and the occurrence upon her ultimate return, caused him to testify as he did on his deposition.

14. The allegations of the impleading petition of unseaworthiness on the part of the Maria, as to the cause of her mate's injury, and shortage of crew, are deemed to have failed for lack of proof.

### Comment:

It is urged for the respondent that there was a shortage of crew in the Maria in that there was no second mate who could substitute for Levantis, the injured mate, which was the reason why the master of the Maria requested the Perch to provide her lifeboat to accomplish the desired transfer, since if the Maria had used her own oar-propelled boat the master would have had to navigate her and thus leave his own ship without proper supervision during the accomplishment of the transfer; from this it is argued that the Maria should be held to have agreed to indemnify the Perch for whatever took place as the result of acceding to the request of the master of the Maria.

Since the proof is not deemed adequate to fasten responsibility upon the Perch for either negligence or lack of seaworthiness, it is not necessary to discuss that argument at length. If it were requisite to a complete disposition of this controversy, a finding would be made that the request for the use of the Perch's lifeboat did not proceed from a misgiving concerning the proper manning of the Maria (which is not decided), or lack of faith in her equipment or lifeboats, but was prompted by a desire to accomplish the transfer of a badly injured man, who could not be treated on his own ship, with no unnecessary delay and under conditions which would be calculated to accomplish the mission with the greatest degree of safety to him.

15. The libelant having been injured in the service of the Perch is entitled to maintenance and cure under the second cause of action as pleaded; he was discharged from the Marine Hospital, Staten Island, on April 14, 1949 and since then has undergone diathermy treatments until the month of May, 1952 and has sought diversion and the exercise that comes from playing golf.

### Comment:

Whether his recovery has progressed as far as it could have if his mental attitude were more constructive, is difficult to say. The libelant's practice prior to 1948 was general, with a preference for obstetrics, and his annual earning capacity was roughly $10,000 a year; in that year he suffered a disability in his right hand which did not prevent his continuing his practice because he is left-handed, but during that year his earnings dropped to less than $4,000. He undertook employment as assistant surgeon on the Perch for a period of six months, and it is a fair inference that he did so for financial reasons as well as in the hope of improving his physical condition.

The injury suffered on January 26, 1949 is shown to have been disabling so far as the actual practice of obstetrics where special conditions are present, such as necessity for a Caesarean section or a breech presentation, but in the normal delivery of a child no unusual or special skill would be required and therefore according to the opinion of Dr. Michele, the libelant is not disabled from functioning as an obstetrician under normal circumstances; obviously he has not been deprived of his professional training and therefore could be expected to function as a general practitioner.

The testimony of Dr. Gould is to the effect that two years' treatment is required but it is not entirely clear whether he measures that from the time of release from the hospital or from the eve of trial when he says he made his last examination; since the testimony does not show that the libelant has received any physiotherapy since May of 1952, it is difficult to fix a time following his discharge from the hospital during which he should have taken advantage of all available professional skill in order to establish his maximum physical capacity, but in order to accomplish what are believed to be the ends of justice, an award will be made as stated in the next finding.

16. The libelant is entitled to an award for maintenance and cure of $7,300, being two and one-half years at the daily rate of $8, which rate was agreed to by the parties.

## Conclusions.

1. The libel is dismissed as to the first cause of action for failure of proof.

2. The libelant is entitled to recover from the respondent an award of $7,300, for maintenance and cure, with costs to be taxed.

3. The impleading petition against the respondent-impleaded is dismissed for failure of proof, with costs to be taxed.

## Comment:

There is no decree directed against the respondent-impleaded in connection with maintenance and cure under the law of this Circuit, The Federal No. 2, 2 Cir., 21 F.2d 313, nor does the prayer of the petition seek that relief.

Settle decree.