David J. BONNETTE and wife, Leslie G. Bonnette, Henry Brumfield, Joel Thompson and wife, Janet Franzine Thompson, Ottis L. Robbins and wife, Kathy Ann Robbins, Plaintiffs,

v.

SHELL OFFSHORE, INC., Shell Oil Company, Whittaker Corporation, Survival Systems Division, and Juan M. Porras, Defendants.

Civ. No. B-92-085.

United States District Court,
S.D. Texas,
Brownsville Division.

Nov. 30, 1993.

Thomas M. Discon, Discon Law Firm, Metairie, LA, Vincent J. DiSalvo, Baton Rouge, LA, William Denton, Biloxi, MS, for plaintiffs.

James Daigle, Lemle & Kelleher, New Orleans, LA, Melchor Chavez, Brownsville, TX, for intervenor-plaintiff Odeco Oil & Gas Co.

Eduardo Roberto Rodriguez, Marjory C. Batsell, Rodriguez, Colvin & Chaney, Brownsville, TX, for defendants Shell Offshore, Inc., and Shell Oil Company.

Jack Lee Allbritton, Fulbright & Jaworski, Houston, TX, for defendant Whittaker Corporation.

Guy Allison, Allison & Huerta, Corpus Christi, TX, Dana Allison Lester, Brownsville, TX, for defendant/cross-plaintiff Juan M. Porras.

## MEMORANDUM AND ORDER

BLACK, United States Magistrate Judge.

This case was assigned to United States Magistrate Judge John Wm. Black by the Honorable Filemon B. Vela, United States District Judge, pursuant to authority granted by 28 U.S.C. § 636(b)(1)(A).

There is pending before the Court Plaintiffs' Motion to Remand. This Motion presents the Court with the task of attempting to draw a line between the jurisdiction of general maritime law and the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.*, in a case involving operations aboard a fixed platform in the Gulf of Mexico. The facts of this case are novel and do not clearly fall within the parameters of existing Fifth Circuit precedent. Nevertheless, the Court must determine whether this case is sufficiently maritime in nature to entitle Plaintiffs to proceed in state court pursuant to the Saving to Suitors clause of 28 U.S.C. § 1333(1).

### Statement Of Facts

The uncontested facts of this case are as follows. Defendant Shell owns a fixed platform in the Gulf of Mexico which is operated under contract by Odeco Oil and Gas Company, (Odeco). All of the workers on the platform are Odeco employees except for Ken Guillotte, the person in charge for Shell. The rig is equipped with two 28–man survival capsules, owned by Odeco and manufactured by defendant Whittaker Corporation. The capsules are round, totally enclosed, motorized and capable of navigating on the high seas for purposes of evacuating platform personnel. Each capsule is normally stowed in its launch platform approximately fifty to sixty feet above the surface of the water. They are operated by releasing a brake which allows the capsule to make a controlled descent on a cable to the water. Once in the water, the occupants of the capsule can release it from its cable by means of a ratchet lever inside the capsule that releases the cable hook from the capsule. The capsule is equipped with food, water and other survival equipment, including a bailer, boat hooks, heaving lines, a compass, and a lifeline.

On the morning of June 2, 1991, Ken Guillotte, the Person in Charge on the platform and a representative of Shell, and Herb Pretus, the Safety Person on the platform and a representative of Odeco, decided to hold a man-overboard drill. Mr. Pretus called a meeting of the roustabout and maintenance crews to discuss the drill. All four Plaintiffs attended the meeting, though Defendant/Cross–Plaintiff Juan M. Porras did not attend. Each individual in attendance was to become familiar with their assigned Station Bill duties aboard the capsule (Report of the Coast Guard investigating officer, page 4, finding # 10). At 11:05 A.M., a life preserver was thrown into the water to simulate a man overboard and the drill began. The four Plaintiffs and Defendant/Cross–Plaintiff Juan M. Porras assembled at the embarkation deck. Plaintiff Ottis Robbins entered the capsule first and started the engine, which was his assigned Station Bill duty as a member of the capsule's crew. The remaining employees entered the capsule after they heard the engine start. Plaintiffs Brumfield and Bonnette were Odeco roustabouts who had no training in the operation of the capsule. They had no duties or responsibilities in the drill and were merely along for the ride. (Supp.Mem. in Opp. to Motion to Remand, page 6, paragraph 9 [uncontested by Plaintiffs]). Plaintiff Thompson had been trained in the operation of the capsule, but took no active role in its operation on this occasion. (*Id.*). Defendant/Cross–Plaintiff Juan M. Porras, an off-duty driller who was trained in the operation of the capsule, was seated at the tiller.

Plaintiff Robbins opened the top hatch of the capsule and looked two decks up on the platform where Mr. Pretus and Mr. Guillotte were observing the drill, and one or both of them gave the signal to lower the capsule to the water. Plaintiff Robbins then closed the hatch and proceeded to operate the release mechanism rather than the lowering mechanism, whereupon the capsule fell approxi-

mately fifty feet to the water, causing the Plaintiffs' injuries. It is undisputed that Plaintiff Robbins operated the wrong lever causing the free fall. (Def. Whittaker Corp. Supp.Mem. in Opp. to Motion to Remand, p. 5, paragraph 7).

Plaintiffs filed suit in state court in Cameron County, Texas alleging state law negligence claims against Shell Oil Company, Shell Offshore, Inc. and Juan M. Porras. Plaintiffs also alleged Maritime Strict Products Liability claims against Whittaker Corporation, Survival Systems Division. Defendants timely removed this action to federal court pursuant to 28 U.S.C. § 1441, asserting federal question jurisdiction arising under 28 U.S.C. § 1331.[1] Defendants maintain that Plaintiffs' claims arise under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., ("OCSLA").

Plaintiffs timely filed a Motion to Remand, alleging that their state court action sounds in admiralty and that it was brought pursuant to the Saving to Suitors clause of 28 U.S.C. § 1333(1). Plaintiffs further assert in their Motion to Remand that the OCSLA "does not create federal question jurisdiction in an action where Plaintiffs have elected to bring a maritime claim in State Court under the Savings [sic] to Suitors Clause," citing *Fogleman v. Tidewater Barges, Inc.*, 747 F.Supp. 348 (E.D.La.1990).

Plaintiffs also claim that removal was improper because Defendant/Cross–Plaintiff Juan M. Porras did not consent to removal. In reply, Defendants argue that Juan M. Porras is fraudulently joined, is thus not a proper defendant, and that his consent is therefore not required for removal. Plaintiffs assert that Juan M. Porras is a proper defendant because he was "the operator and temporary master of the life capsule, whose

negligence approximately [sic] caused the Plaintiffs' injuries." (Motion to Remand, p. 3). Plaintiffs claim that Juan M. Porras would also be a proper Defendant in an action pursuant to § 5(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., ("LHWCA").

### Memorandum and Order

The Court has found no cases factually similar to this case involving fixed platforms, but has found several cases involving similar facts which are of limited usefulness here. *See generally, McKenney v. U.S.*, 99 F.Supp. 121 (N.D.Cal.1951); *Irwin v. U.S.*, 111 F.Supp. 912 (E.D.N.Y.1953); *Manhat v. U.S.*, 220 F.2d 143 (2nd Cir.1955); *Morrell v. U.S.*, 193 F.Supp. 705 (N.D.Cal.1960); *Wright v. Maryland Boat Line, Inc.*, 351 F.2d 922 (1st Cir.1965). The Court has found several cases procedurally similar, that is, cases involving a state petition alleging state law causes of action, removed based on OCSLA with remand sought based on the saving to suitors clause. The Court has reviewed these published and unpublished opinions dealing with remand of maritime/OCSLA cases, including: *Coody v. Exxon Corporation*, 630 F.Supp. 202 (M.D.La.1986); *White v. Chevron U.S.A., Inc.*, 1990 WL 28167 (E.D.La. March 14, 1990); *Shelton v. Tidewater, Inc.*, 1990 WL 103658 (E.D.La. July 16, 1990); *Cahee v. Shell Offshore, Inc.*, 1990 WL 98864 (E.D.La. July 6, 1990); *Fogleman v. Tidewater Barges, Inc.*, 747 F.Supp. 348 (E.D.La.1990); *Broussard v. John E. Graham & Sons*, 798 F.Supp. 370 (M.D.La.1992); *Baker v. Chevron U.S.A., Inc.*, 1992 WL 245573 (E.D.La. Sept. 8, 1992) (*Baker* I) (case remanded because purely platform tort).[2]

---

**1.** The Court notes that Defendants did not plead diversity as a ground for removal in their Notice of Removal, and the Court therefore makes no finding as to the existence of diversity in this case.

**2.** This Court has also reviewed the following cases: *Peters v. Pumpkin Air, Inc.*, 635 F.Supp. 825 (M.D.La.1986) (The court closely followed *Coody*, remanding a case in which a helicopter crashed into a fixed platform. 635 F.Supp. at 830.); *Felty v. Amerada Hess Corporation*, 1992 WL 404272 (E.D.La. Dec. 29, 1992) (The court

found that since the plaintiff slipped on the platform upon his exit from a helicopter, the tort was exclusively a platform tort since the maritime locality test could not be satisfied. The court denied remand on the basis of federal question removal jurisdiction arising under OCSLA.); *Stroud v. Petroleum Helicopters, Inc.*, 1992 WL 300828 (E.D.La. Oct. 14, 1992) (A platform worker was killed when the helicopter transporting him to the fixed platform crashed into a Mississippi River marsh. Plaintiff, Stroud's wife, sued based on negligence and strict liability and

The *Coody* case involved the transfer of a platform worker from a vessel to a fixed platform. Defendants removed to federal court, alleging that the suit was based on the OCSLA. Plaintiffs then moved for remand, contending that their action was premised on general maritime law and brought in state court pursuant to the saving to suitors clause. The court found that plaintiffs had no desire to proceed under federal law, as indicated by their having filed suit in state court under the saving to suitors clause. *Coody*, 630 F.Supp. at 205. In that light, it was irrelevant that an action could have been filed based on OCSLA. *Id.* The court, in essence, deferred to plaintiff's choice of law and forum, and remanded the case to state court.

The court in *White* denied remand in a case in which injuries occurred on a fixed platform. Defendants contended that the plaintiff's state law cause of action could only be brought pursuant to OCSLA because of the platform situs of the injury. Plaintiffs cited *Coody* for the proposition that they chose not to proceed under OCSLA and that therefore, the case was not removable. The *White* court distinguished those cases, noting that in each, there were allegations of maritime jurisdiction which gave rise to the right to proceed in state court under the saving to suitors clause, while in the case before it, there were no such allegations. The *White* court went further, noting that the application of maritime law, and through it the saving to suitors clause, would probably be inappropriate based on the facts of the case.

The *Shelton* court remanded a case in which a fixed platform worker was injured aboard a vessel while assigned to pump drilling mud from that vessel to the platform. The court found maritime law to be the substantive law applicable to the accident. Plaintiffs, however, had asserted only "a claim in negligence," without invoking maritime law or the saving to suitors clause in their state court petition. Defendants asserted that the federal court had jurisdiction through OCSLA, even though the plaintiffs did not base their action on OCSLA; defendants claimed that since plaintiffs did not specifically mention maritime law or saving to suitors in their state petition, they had not clearly elected to proceed under it. The court rejected that argument, stating that the fact that plaintiffs filed suit in state court makes it clear that state court is where they intended to pursue their remedy, and that there are no "magic words" by which plaintiffs must invoke the saving to suitors clause in their state petition.

In *Cahee*, plaintiff was injured when he was being transferred from the fixed platform to a crew boat in a personnel basket by a platform crane. The court found jurisdiction under OCSLA because it was a platform tort, even though plaintiff had not pled OCSLA in his state court petition.

Next came *Fogleman*, in which the court remanded a case involving a fixed platform worker who was assigned to unload coiled tubing from a vessel and who slipped on fish slime on the deck of the vessel, injuring himself. Plaintiff filed suit in state court alleging negligence. Defendants removed,

defendants removed based on the OCSLA. The court premised its decision on whether plaintiff had asserted a claim pursuant to OCSLA in her state court petition. The court rejected the argument of defendants that the "but for" test of *Barger v. Petroleum Helicopters*, 692 F.2d 337 (5th Cir.1982) applied to the facts of the case, finding that *Barger* was distinguishable in that it was filed pursuant to federal law. Further, the court found that the test in *Barger* was used to determine when a plaintiff receives compensation under the LHWCA and was not used to determine subject matter jurisdiction. Given that plaintiff had not evidenced any intent to proceed under federal law, the court followed *Coody* and *Fogleman* in finding no subject matter jurisdiction pursuant to OCSLA and remanded

the case.); *Baker v. Chevron U.S.A. Inc.*, 1992 WL 404264 (E.D.La. Dec. 29, 1992) (*Baker* II) (The court reconsidered the remand which it ordered in *Baker* I in light of *Stroud*. In refusing to alter its earlier decision, the court found *Stroud* to be distinguishable in that the death in *Stroud* occurred in Louisiana and not on the outer continental shelf. The court also found *Fogleman* and *Coody* to be distinguishable because admiralty was alleged in both of those cases, whereas it was not in the case before the court. Rather, the case before the court was based on state law and the removal was based on OCSLA. Combined with the fact that the injury occurred on a fixed platform in the Gulf of Mexico, the court found OCSLA applicable and denied remand.)

asserting OCSLA jurisdiction. Plaintiff asserted maritime jurisdiction, and through it, saving to suitors. The court found that "even if the facts alleged in the state court petition were to satisfy the 'but for' test [for OCSLA jurisdiction], admiralty jurisdiction would govern the case as long as the Executive Jet test is concurrently met." *Fogleman*, 747 F.Supp. at 355. "[W]here the Executive Jet test is satisfied . . ., OCSLA cannot be a basis for federal question removal because the case necessarily has a maritime character." *Fogleman*, 747 F.Supp. at 355–56.

The *Broussard* court denied remand in a case factually similar to *Coody*. In *Broussard*, the plaintiff was injured while being transferred from the fixed platform on which he worked to a vessel. The court, based on its analysis of *Recar v. CNG Producing Co.*, 853 F.2d 367 (5th Cir.1988) and the fact that the plaintiff's state court petition was filed under the "Laws of Louisiana," found that OCSLA applied and denied remand. The court considered the sole issue before it to be whether OCSLA applied and invested the court with federal question jurisdiction. *Broussard*, 798 F.Supp. at 370. The court found that the plaintiff's state court petition raised claims under both maritime law and Louisiana law, and based on its analysis, which emphasized OCSLA over maritime law, found that the state law claims could only be brought as surrogate federal law claims under OCSLA, and that the maritime law claims would be brought in under supplemental jurisdiction. *Broussard*, 798 F.Supp. at 375.

This Court follows the spirit of *Coody* in showing deference to a plaintiff's choice of law and forum. The Court also accepts the reasoning and holding of *Fogleman* that maritime law trumps OCSLA jurisdiction in a removal situation when the two overlap. The reasoning in *Shelton* as to the lack of deter-

minative value to be placed in a plaintiff's failure to plead saving to suitors in his state court petition is also adopted by this Court. This Court declines to follow the holding of *Broussard*.

▮ Each of the cases reviewed above, with the exception of *Broussard*, follows essentially the same reasoning. When there is a motion to remand a case originally brought in state court under state law or mixed state and maritime causes of action and subsequently removed to federal court under alleged OCSLA jurisdiction, the courts look at (1) whether the tort is strictly a platform tort, or whether there are maritime implications. If it is strictly a platform tort, then remand is denied because OCSLA is the substantive law to be applied to the case. If there are maritime implications, then (2) the court must analyze whether maritime law is applicable, thus overriding OCSLA applicability under *Fogleman*. This is where an analysis under *Executive Jet*[3] and *Kelly v. Smith*[4] becomes necessary.·

▮ Although Plaintiffs are the masters of their case,[5] and their choice of law and forum should be given the greatest possible deference, it is incumbent upon this Court to determine whether they have the right to pursue that course under the law. In this case, Plaintiffs claim the right to proceed in state court under state law pursuant to the saving to suitors clause, which is an option provided in cases· which could also be brought under federal admiralty jurisdiction. *See*, Schoenbaum, Admiralty and Maritime Law § 3–13 (1987). If Plaintiffs have no right to proceed in admiralty, then they have no right to utilize the saving to suitors clause. *Cf.*, Schoenbaum, *supra; compare, Coody*, 630 F.Supp. 202 (remanded based on assertion of saving to suitors), *and, Shelton*, 1990 WL 103658 (remanded based on assertion of maritime law), *and, Fogleman*, 747 F.Supp. 348 (remanded because maritime and asser-

**3.** *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).

**4.** *Kelly v. Smith*, 485 F.2d 520 (5th Cir.1973), *cert. denied, sub nom. Chicot Land Company, Inc. v. Kelly*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

**5.** *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 22, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983) (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913)).

tion of saving to suitors); *with,* *White,* 1990 WL 28167 (not remanded because strictly platform tort and admiralty did not apply), *and,* *Cahee,* 1990 WL 98864 (platform tort not remanded), *and,* *Baker,* 1992 WL 245573 (not remanded because platform tort and admiralty did not apply). If they do have a right to proceed in admiralty, then their decision to pursue state law claims under the saving to suitors clause rather than under OCSLA is given deference, and the case should be remanded. *See, Coody,* 630 F.Supp. at 205–06; *Fogleman,* 747 F.Supp. at 350, 354–56.

█ Plaintiffs in the instant case have made it clear that they did not intend to proceed under federal law, but rather chose to proceed under state law pursuant to the saving to suitors clause. It is also obvious that Plaintiffs chose to proceed in state court and that they asserted only state law causes of action without reference to OCSLA in their state petition. Plaintiffs did not mention the saving to suitors clause in their state petition. This Court agrees with the *Shelton* court that the fact that a plaintiff does not plead saving to suitors expressly in the state petition is not determinative as to whether his suit may be brought in state court under that clause.

The question to be resolved in this case is: (1) does OCSLA apply, or; (2) does maritime law apply. If maritime law applies, then following the reasoning in *Fogleman,* this case must be remanded to the state court as the Plaintiffs choice of forum under the Saving to Suitors Clause of 28 U.S.C. § 1333(1). If it does not apply, and the OCSLA applies, then this Court must determine whether the consent of Defendant Juan M. Porras was necessary for removal. If not, then this case was properly removed and must remain in federal court.

## Applicability of OCSLA

█ There is little question but that Plaintiffs have pled facts sufficient to bring them within the scope of OCSLA. The Plaintiffs are all fixed platform workers, injured in the course of routine platform operations, to wit, a man-overboard drill. The issue before the Court is not whether OCS-

LA applies to this case, but whether it is preempted by maritime law under the reasoning of *Fogleman.* Under *Dupont v. Sandefer Oil & Gas, Inc.,* 963 F.2d 60, 61 (5th Cir.1992), *Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 459 (5th Cir.1992), and *Union Texas Petroleum Corp. v. PLT Eng'g,* 895 F.2d 1043, 1047 (5th Cir.1990), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990), the test for application of adjacent state law as surrogate federal law under OCSLA is: (1) the controversy must arise on an OCSLA situs, (2) federal maritime law must not apply of its own force, and (3) state law is not inconsistent with federal law. Part one and part three of the test are met in this case. The question, once again, is whether maritime law applies of its own force.

## Applicability of Maritime Law

█ The case of *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) provides a two-part test to determine whether maritime law applies to a particular fact situation. It is supplemented by *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). It is also supplemented in the Fifth Circuit by *Kelly v. Smith,* 485 F.2d 520 (5th Cir.1973), *cert. denied sub nom, Chicot Land Company, Inc. v. Kelly,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), and *Molett v. Penrod Drilling Co.,* 826 F.2d 1419 (5th Cir.1987).

In *Executive Jet,* the Supreme Court supplemented the traditional "locality test" for determining maritime jurisdiction in aviation tort cases. The Court added the requirement that the wrong bear a "significant relationship to traditional maritime activity," what has become known as the "maritime nexus" test, thus creating a two-pronged test for maritime jurisdiction in aviation tort cases. *Executive Jet,* 409 U.S. at 267–68, 93 S.Ct. at 504. In *Foremost,* the Court held that the *Executive Jet* test was not limited to aviation torts and that involvement in commercial maritime activity is not essential. *Foremost,* 457 U.S. at 674–75, 102 S.Ct. at 2658.

The Fifth Circuit has filled in the interstices left by the Supreme Court. In *Kelly,* the Fifth Circuit held that there are four factors to consider in determining whether a maritime nexus exists: (1) the functions and roles of the parties; (2) the types of vehicles and instrumentalities involved; (3) the causation and type of injury; and (4) traditional concepts of the role of admiralty law. *Kelly,* 485 F.2d at 525. The question to be asked in analyzing each factor under the *Kelly* test is whether or not it raises considerations which create a significant nexus to traditional maritime activities. *See, Molett,* 826 F.2d at 1427. This analysis is necessarily a factual one, owing to the nature of the questions to be resolved.

In *Molett,* the Fifth Circuit supplemented its four-part *Kelly* test to accommodate the Supreme Court's decision in *Foremost,* finding "that indicia of maritime flavor can be found in: (1) the impact of the event on maritime shipping and commerce; (2) the desirability of a uniform national rule to apply to such matters; and, (3) the need for admiralty 'expertise' in the trial and decision of the case." *Molett,* 826 F.2d at 1426. The court in *Molett* expressly did not abandon *Kelly,* but applied "both its analysis and the indicia divined from *Executive Jet* and *Foremost* " to the fourth factor in the *Kelly* test. *Id.* However, in *Molett* II, *Molett v. Penrod Drilling Co.,* 872 F.2d 1221 (5th Cir.1989), a Fifth Circuit panel, including one circuit judge from the *Molett* I panel, seemed to ignore the test enunciated by *Molett* I in deciding the applicability of maritime law to a different defendant in that case, thus making it questionable whether that test is a permanent part of Fifth Circuit jurisprudence. *See, Sisson v. Ruby,* 497 U.S. 358, 365–66 n. 4, 110 S.Ct. 2892, 2897 n. 4, 111 L.Ed.2d 292 (1990). The *Molett* I test was ignored in *Taylor v. Kennedy Engine, Inc.,* 861 F.2d 127 (5th Cir.1988), as well as in *Watson* on behalf of *Watson v. Massman Construction Co.,* 850 F.2d 219 (5th Cir. 1988). It was followed in *Reecer v. McKinnon Bridge Co.,* 745 F.Supp. 485 (M.D.Tenn. 1990), and it was adopted in the First Circuit by *Shea v. Rev–Lyn Contracting Co.,* 868 F.2d 515, 518 (1st Cir.1989).

Plaintiffs cited to *Molett* in their initial brief, but then dropped all reference to it and its test in subsequent memoranda filed on this Motion, relying instead on the *Kelly* test alone. Only the Fifth Circuit can decide the issue of whether the *Molett* I factors are still viable. However, the factors enunciated in *Molett* I were derived from the undisturbed principles set forth by the Supreme Court in *Foremost.* Therefore, the three-part test of *Molett* I, while not as well-settled as the *Kelly* test, is still useful, though not necessarily determinative, for deciding whether a maritime nexus exists in this case. Additionally, *Molett* II, 872 F.2d at 1226, and *Watson,* 850 F.2d at 223, each cite *Molett* I for its equation of the fourth prong of the *Kelly* test with the statement in *Executive Jet* outlining the Supreme Court's view of the traditional concerns of admiralty law. *Executive Jet,* 409 U.S. at 270–71, 93 S.Ct. at 505. These views are important to this Court in making its determination of whether the fourth prong of the *Kelly* test is satisfied in this case.

Locality

The first prong of the *Executive Jet* test for admiralty jurisdiction is the traditional maritime locality test. *Executive Jet,* 409 U.S. at 253–54, 93 S.Ct. at 497. As stated in *The Plymouth,* 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1865):

"[T]he wrong and injury complained of must have been committed wholly upon the high seas of navigable waters, or, at least, the substance and consummation of the same must have taken place upon these waters to be within the admiralty jurisdiction." 70 U.S. (3 Wall.) at 35, 18 L.Ed. at 128.

It is not the place where the negligent act occurred that is important in determining the where the tort occurs, but rather it is the place of injury that controls. *Taylor v. Kennedy Engine, Inc.,* 861 F.2d 127, 128–29 (5th Cir.1988); *Smith v. Pan Air Corp.,* 684 F.2d 1102, 1111 (5th Cir.1982); *West v. Chevron U.S.A., Inc.,* 615 F.Supp. 377, 379 (C.D.La. 1985). A tort occurs "where the impact of the act or omission produces such injury as to give rise to a cause of action. [citation

omitted] Without an injury there is no cause of action, no tort but only 'damnum absque injuria.' [citation omitted] It is of little significance that the acts complained of had a land based origin." *McCall v. Susquehanna Elec. Co.*, 278 F.Supp. 209, 211 (D.C.Md. 1968).

Defendants cite several cases which they contend militate against maritime locality; *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969); *Bertrand v. Forest Oil Corp.*, 441 ·F.2d 809 (5th Cir.1971); *Bible v. Chevron*, 460 F.2d 1218 (5th Cir.1972); and, *In re Dearborn Marine Service, Inc.*, 499 F.2d 263 (5th Cir.1974). (Joint Opposition to Motion to Remand, pp. 5–7). The court in *Dearborn*, denying admiralty jurisdiction, addressed the same cases Defendant cites:

> Twice we have found maritime law inapplicable to claims by platform workers pushed into surrounding seas by platform-based equipment, even though substantial ·injuries may have been physically caused by the water itself. (citations omitted) *Dearborn*, 499 F.2d at 273–74.

The *Dearborn* court relied principally on the locality test, mentioning *Executive Jet* and a lack of maritime nexus as only a secondary basis for its decision. The other decisions discussed by Defendants and the *Dearborn* court are all pre-*Executive Jet*. This does not limit their usefulness in determining whether there is maritime locality, as Plaintiffs contend (Plaintiffs' Supp. Brief in Support of Motion to Remand, pp. 6–7), any more than it limits the usefulness of *The Plymouth*, cited by Plaintiffs in support of their argument. *See, Taylor*, 861 F.2d at 129. All of the pre-*Executive Jet* decisions apply the locality test, whether or not they find maritime law to be applicable, and they are useful for an analysis of that prong of the *Executive Jet* test. *Id.*

As the *Dearborn* court noted in the passage above, the Fifth Circuit in these pre-*Executive Jet* cases has found no maritime jurisdiction where workers are pushed into the water by platform-based equipment. The same is generally true of cases in which workers are pushed into the water off of piers or docked ships. *See, Chapman v. City of Grosse Pointe Farms*, 385 F.2d 962, 964–65 (6th Cir.1967). The word invariably used to describe the relationship of the plaintiffs in those types of cases to a maritime locality is "fortuitous." *E.g., Executive Jet*, 409 U.S. at 274, 93 S.Ct. at 507; *Dearborn*, 499 F.2d at 274. The only facts that distinguish this case from the others is that the Plaintiffs here were inside what is arguably a vessel, and it was in the attempted operation of that "vessel" by its "crew" that it was caused to fall to the sea. The fall was not caused by the operation of any equipment on the platform itself, but by the misoperation of the capsule's own internal operating mechanism. Further, it is difficult to conceive of a situation in which an escape capsule in free fall would fall anywhere except the water, it being designed to facilitate quick, water-borne escape from platform-based danger. In other words, it cannot be said that the fall of the escape capsule into the water was merely fortuitous.

The Plaintiffs' injuries occurred upon impact with the surface of the navigable waters of the Gulf of Mexico while they were in what is arguably a vessel. Though this connection is tenuous in view of the fact that the only connection to navigable waters is that the capsule fell there, the maritime locality prong of the *Executive Jet* test is clearly met in this case.

Maritime Nexus

The second prong of the *Executive Jet* test for admiralty jurisdiction is what is sometimes called the "maritime nexus" test. *Executive Jet*, 409 U.S. at 267–68, 93 S.Ct. at 504. Guided by *Kelly*, the first step in analyzing whether or not there is a maritime nexus in this case is to look at the functions and roles of the parties. *Kelly* 485 F.2d at 525.

For purposes of a *Kelly* analysis, this Court need not make a determination as to whether the injured Plaintiffs were seamen. It is enough that the Plaintiffs were engaged in what is traditionally seaman's work, that is, practicing for the possibility of rescuing a man-overboard. They also practice for the possibility of abandoning their platform for the sea in time of emergency. In either

situation, these quintessential platform workers are required to master skills that are required of any knowledgeable seaman. As noted by the Coast Guard in its report, these platform workers are assigned Station Bill duties, which include their duties on the escape capsules when necessary. These men must not only be able to launch their escape capsules, but they must also be able to navigate them in such as manner as to most quickly effectuate their intent, whether it be escape from danger or rescue of a fellow worker. Though it is far from certain that the performance of these duties is enough to confer any measure of seaman status upon fixed platform workers, what is clear is that they are required to perform seaman's work, and given the dangers of their profession, should be able to perform those few seaman's tasks quickly and efficiently. The first factor of the *Kelly* test favors maritime jurisdiction.

The second factor of the *Kelly* test is an evaluation of the types of vehicles and instrumentalities involved. *Kelly,* 485 F.2d at 525. One instrumentality involved in this case is the platform itself. It is well-settled that a fixed platform is not a vessel. *See, Rodrigue v. Aetna Casualty and Surety Company,* 395 U.S. 352, 355, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969). Rather, a fixed platform is an artificial island, to be treated in the same manner as a federal enclave in an upland state. *Id.* This status, by itself, seems to indicate that OCSLA jurisdiction might be appropriate. However, when it is considered that the platform played no role in this incident, other than to serve as the stage for its consummation, the OCSLA connection is lessened. The platform in this case played the role of a dock or pier, to which a vessel fastens itself. The mere fact that a vessel happens to be tied to, docked at, or otherwise attached, to land or a fixed platform does not affect its status as a vessel. There are other factors that go into making such a determination, such as whether the vessel is permanently docked, under repair, under construction or otherwise unnavigable. None of these factors comes into play in this case.

In reading the cases in this area, the Court has seen nothing that indicates that an actual finding of vessel status is necessary in a *Kelly* analysis, and the Court is reluctant to make such a finding if it is not necessary. However, the Court's reading of the statutory definitions and case law on the subject of vessel status indicate that the escape capsule involved in this case, given its equipment and function, might well fit within the broad definition of a vessel. *See, Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 293 (5th Cir.1990) (Speaking of the "arguable vagueness of the term 'vessel,'" the 5th Circuit stated: "Not surprisingly, it has been suggested that 'three men in a tub would also fit within our definition, and one probably could make a case for Jonah inside the whale.'"). The second *Kelly* factor weighs in favor of maritime jurisdiction.

The third *Kelly* factor to be considered is the causation and type of injury. *Kelly,* 485 F.2d at 525. While the injuries in this case are not peculiarly maritime, they are also not foreign to maritime law. The causation of the injuries, however—the falling of a lifeboat from its davits to the sea—is particularly maritime. *See e.g., McKenney v. U.S.,* 99 F.Supp. 121 (N.D.Cal.1951) (admiralty jurisdiction for falling lifeboat); *Irwin v. U.S.,* 111 F.Supp. 912 (E.D.N.Y.1953) (admiralty jurisdiction for falling lifeboat); *Morrell v. U.S.,* 193 F.Supp. 705 (N.D.Cal.1960) (Libel brought under the Suits in Admiralty Act and the Public Vessels Act). The third factor of the *Kelly* test is met in favor of maritime law.

The fourth and final factor to be considered under *Kelly* is whether the facts of this case implicate traditional concepts of the role of admiralty law. *Kelly,* 485 F.2d at 525. Though it is not clear, as discussed earlier, whether the *Molett* I factors are to be followed in the Fifth Circuit, it is clear from both *Molett* I and II, and from *Watson,* cited earlier, that the fourth prong of the *Kelly* test is to be equated with the statement in *Executive Jet* which outlined the Supreme Court's view of the traditional concepts of admiralty law. *Executive Jet,* 409 U.S. at 270–71, 93 S.Ct. at 505. First, this Court will analyze the facts of this case in light of the Supreme Court's view of the traditional concepts of admiralty law. In *Executive Jet,* the Supreme Court states:

The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage. *Executive Jet,* 409 U.S. at 270–71, 93 S.Ct. at 505.

The question to be answered at this point is whether the facts of the incident involved in the instant case implicate any of these traditional concerns of maritime law. This case does not involve navigation at sea nor a collision between two ships at sea. There are, as of yet, no allegations of unseaworthiness as to the escape capsule and there are no issues of maintenance and cure. There are no maritime liens involved, nor is the general average required for resolution of the allegations made by the Plaintiffs in this case. There arise no issues of capture or prize, cargo damage, nor are there any claims for salvage. Limitation of liability does arise in another action involving Odeco and the Plaintiffs in this action, but that issue is not before this Court.

Of course, this restatement of the Supreme Court's list of traditional maritime concerns cannot encompass every issue that a court sitting in admiralty has rightly considered under its maritime jurisdiction. This list touches only on the mainstream, everyday concerns of the admiralty law, without reaching "the perverse and casuistic borderline situations that have demonstrated some of the problems with . . . maritime tort jurisdiction." *Executive Jet,* 409 U.S. at 255–56, 93 S.Ct. at 498. This case is an example of the latter situations.

It is unquestionable that maritime law is generally concerned with injuries to seamen in the performance of their duties. *See, Executive Jet,* 409 U.S. at 253–56, 93 S.Ct. at 497–98 (quoting G. Gilmore & C. Black, The Law of Admiralty 24 n. 88 (1957)). It is even concerned with seamen ashore, as evidenced by the law of maintenance and cure. There is also no doubt that the maritime law is concerned with the ability of seamen to escape their ships in emergencies. *See e.g., McKenney,* 99 F.Supp. 121 (N.D.Cal.1951); *Irwin v. U.S.,* 111 F.Supp. 912 (E.D.N.Y. 1953). The use of lifeboats and the execution of lifeboat and man-overboard drills are an essential part of maritime activity. *See generally, id.* The question is whether a lifeboat drill retains its maritime character when it is carried out from an artificial island by workers who are not seamen, but oilmen.

This Court believes that it does. The reasons for having escape capsules aboard a fixed platform are identical to those for having lifeboats aboard ships. Their function in an emergency is identical, whether that emergency requires abandonment of the platform or the emergency rescue of a man-overboard. One of the greatest difficulties contained in the facts of this case is that the escape capsule was never successfully launched, and never actively navigated on the high seas. It is clear, however, that if the escape capsule had been successfully launched, navigated on the sea beneath the platform and collided with a ship or other vessel, maritime jurisdiction could be implicated. Defendants allude to this possibility in their Joint Opposition to Motion to Remand at page eleven. It is likewise clear that if the escape capsule had been under repair at the time of its fall to the sea, rather than undergoing launch procedures, a much stronger case of OCSLA jurisdiction could be made. This case straddles the line between these two clear hypothetical situations.

This Court is of the opinion that, under these facts, the line between OCSLA and maritime jurisdiction should be drawn at the point at which the platform workers take on the role of operators of the escape capsule. The Supreme Court, in *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 92 S.Ct. 418, 30

L.Ed.2d 383 (1971), observed that the gangplank serves as the dividing line between state law and maritime law, between the dock, which is an extension of land, and the vessel. *Victory Carriers,* 404 U.S. at 206–07, 92 S.Ct. at 422. Similarly, this Court draws the line between OCSLA and maritime jurisdiction at the point where the platform ends and the escape capsule begins. Though there is no gangplank, it is the crossing of that threshold between the platform and the capsule that marks the boundary between OCSLA and maritime jurisdiction.

If this Court were to find OCSLA applicable to this case based on the fact that the Plaintiffs had not successfully launched the capsule and thus not come within maritime jurisdiction, the question of where to draw the line between OCSLA and maritime jurisdiction would be less clear. Would the line be drawn where the capsule touched the water, or after it had navigated some arbitrary distance from the platform? Perhaps the line should not be drawn at all and OCSLA should apply to the entire operation of a fixed platform escape capsule. The problem there is that that requires an intrusion of OCSLA into the high seas surrounding the platform and it is not clear that OCSLA was intended to be stretched that far. In short, drawing the line between OCSLA and maritime jurisdiction at the point of entry into the capsule for purposes of operating it on the high seas seems the most logical place at which to demarcate the boundary between OCSLA jurisdiction and maritime jurisdiction.

When the Plaintiffs in this case entered the capsule, they each did so for the purpose of either operating it, practicing its operation, or observing its operation. If, at the time they did so, they were unprepared or otherwise lacked sufficient training to do this effectively, that fact would impair their ability to act in a genuine emergency to escape from the platform to the relative safety of the sea. Questions as to proper training are for the jury, but they serve to evidence the connection in this case to traditional concepts of the role of admiralty law.

An analysis of the fourth prong of *Kelly* under *Molett* I, however, militates against a finding of maritime jurisdiction. The incident involved in this case had no impact on maritime shipping and commerce, and it is difficult to conceive of a situation in which it could have such an impact. There is no need for a uniform national rule to apply to such incidents as this one, and there is no need for admiralty expertise in the trial and decision of the case. The facts of this case fall squarely outside the scope of traditional maritime concerns under the test from *Molett* I. Given the uncertainty as to the status of this test in the Fifth Circuit, this result is not determinative of the existence of a relationship to traditional concepts of the role of admiralty law. Taken together, the four *Kelly* factors indicate that a maritime nexus exists.

### Fraudulent Joinder

A claim under LHWCA § 5(b) "must be predicated on facts warranting the invocation of admiralty jurisdiction." *Shea v. Rev–Lyn Contracting Co., Inc.,* 868 F.2d 515, 517 (1st Cir.1989) (citing *Drake v. Raymark Industries, Inc.,* 772 F.2d 1007 (1st Cir.1985), *cert. denied,* 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986)); *May v. Transworld Drilling Co.,* 786 F.2d 1261, 1264 (5th Cir. 1986), *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986) ("Following prior Fifth Circuit precedent and the recent First Circuit decision in *Drake v. Raymark Industries, Inc.,* we here explicitly hold that § 5(b) permits only the assertion of a claim for a maritime tort."); *See, Richendollar v. Diamond M Drilling Company, Inc.,* 819 F.2d 124, 127–28 (5th Cir.1987), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). Because this Court has found that maritime law does apply in this case, there is potentially a basis for a cause of action against Juan Porras under LHWCA § 5(b). Given the disposition of this case, however, determination of whether there has been fraudulent joinder is not necessary. Although this Court has grave doubts as to the viability under the law of a LHWCA § 5(b) cause of action against Juan M. Porras, this Court will not rule on the merits of that question.

*Summary*

The maritime locality and maritime nexus tests of *Executive Jet* and *Kelly* are satisfied by the facts of this case. Since maritime law is applicable, Plaintiffs have the option to proceed in state court under state law pursuant to the saving to suitors clause if they so choose. The Court understands the compelling arguments made by the Defendants in favor of removal. The question of the applicability of OCSLA versus maritime law in this case is a close one and excellent arguments have been made for both sides. However, the Court feels that its finding of admiralty jurisdiction based on the analysis above, combined with its recognition of the traditional concept of allowing Plaintiffs to be the masters of their cases, leads to the conclusion that this case should be remanded.

IT IS THEREFORE **ORDERED, ADJUDGED, AND DECREED** that Plaintiffs' Motion to Remand should be and is hereby **GRANTED.** Accordingly the Clerk of this Court shall remand this cause to the 103rd Judicial District Court, Cameron County, Texas.